[Crim. No. 7852. In Bank. May 11, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. HARRY W. SCHADER and JAMES L. TURNER, Defendants and Appellants.

Benjamin M. Davis and William H. Lally, under appointment by the Supreme Court, and Elfriede Sobiloff for Defendants and Appellants.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Doris H. Maier, Assistant Attorney General, and Edsel W. Haws, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—Defendants Schader and Turner appeal from a judgment on a jury verdict finding them guilty of the crime of murder in the first degree as charged in Count I of an indictment returned by the Grand Jury of Sacramento County on August 6, 1963, and of the crime of robbery in the first degree as charged in Count II of the indictment. Schader's penalty for the crime of murder was fixed by the jury at death, and Turner's at life imprisonment. Defendants' motion for a new trial was denied. Schader's automatic appeal is before us pursuant to section 1239, subdivision (b) of the Penal Code, and Turner appeals from the judgment.

Officer Eugene McKnight of the Sacramento Police Department was killed during the course of the robbery of a grocery store on July 23, 1963, under the following circumstances:

A checker in the store testified that at about 6:45 p.m. on that date Turner pushed a shopping cart into the service area of her checkstand. Turner, exposing a gun, told her to leave the items alone and "fill the bag." At Turner's direction she took money from several cash registers and placed it in

the bag, the total amount being $1,370.51. Turner then took the bag and proceeded out the door.

A store clerk, witness Brown, had observed defendants in a conversation at the produce area of the store prior to the activity at the cash registers. Brown saw Schader standing in the vicinity of a second checkstand. As Turner left the store Schader moved around the shopping cart at the first stand and followed him out the door.

Officer McKnight and his wife were in the customer line at the first checkstand behind Turner. They remained in this position during the time the money was removed from the cash registers and as Schader was leaving the front door Officer McKnight drew his revolver and followed him. The officer was dressed in civilian clothes and was off duty.

When the officer reached the sidewalk area outside the front door of the store he stated, ''Hold it right there.'' He caught up with Schader about 50 feet from the store door; at this time Turner was entering a green Chevrolet parked about 30 feet from Schader. McKnight placed his left hand on Schader's shoulder. McKnight's gun was in his right hand and was pointed at the green Chevrolet. Schader moved quickly behind the officer and drew his own gun. Witness O'Brien testified that Schader stood behind the officer holding the latter's left arm in an arm lock; that Schader ''reached the gun up to the man's neck and pushed it down against his neck''; that he then heard the report of the gun and the officer fell to the sidewalk. The bullet, of .38 caliber, entered the left side of the officer's neck, fracturing the vertebrae, severing the spinal cord, and coming to rest in the mouth along the surface of the right side of the jaw. The autopsy surgeon was of the opinion that death was instantaneous due to the severance of the spinal cord.

Schader ran to the Chevrolet after the officer fell to the ground and the car proceeded from the parking lot in a southerly direction. It was next seen by a witness, Mr. Norris, parked in front of his residence. He saw defendants run from the Chevrolet to a nearby parking lot where they entered a 1961 red Cadillac convertible with a black top. The car proceeded up Broadway in an easterly direction. Norris reported the incident to a police officer who relayed the information by radio to the police station.

Witness Morris, a California Highway Patrolman, received a radio report at approximately 7 p.m. that a Sacramento policeman had been killed in a market holdup; that the rob-

bers were believed to be in a late model red Cadillac driving in an eastbound direction out of Sacramento. The officer parked his patrol car on an off-ramp of the Roseville freeway where he was able to observe eastbound traffic. Shortly after stopping his car he saw a late model red Cadillac with a black top go by at a speed of approximately 60 miles per hour. He followed, and the car began to slow down. The officer stated that ''the individual driving the car did not fit the Cadillac in that he looked not dressed for the vehicle. That he looked too young to own the vehicle.'' The officer turned on his red light and stopped the Cadillac. Schader, the driver, got out of the car and walked back to the patrol car which was parked about 20 feet behind. Schader asked, ''Have I done something wrong, officer?'' The officer drew his gun as he got out of the patrol car and, with the gun pointed at Schader, directed Schader to lie on his stomach on the ground facing the patrol car, with his arms and legs straight out.

The officer then approached the Cadillac. He noticed it shake slightly. At this point Schader stated in a loud voice, ''It looks like they've got us, Turner.'' Turner had been hiding under a pile of clothes in the rear seat. He raised his hands and was directed by the officer to lie on the ground in spread-eagle fashion. His wrist was handcuffed to the wrist of Schader. Two .38 caliber revolvers were on the front seat of the Cadillac and a brown bag was discovered containing $1,370.51.

Later in the evening, defendant Schader made a statement to police officers which was recorded. He stated that at the time he and Turner went into the market they planned to rob the market at that time and that he observed Turner committing the robbery. Schader, admitting that he knew at the time of the shooting that the victim was a police officer, said that he thought the officer was attempting to apprehend Turner. He also admitted shooting the officer, although he said the revolver fired accidentally.

Defendant Turner also made a recorded statement that evening. He admitted planning with Schader to rob the market and committing the robbery. He said that Schader knew of the robbery and shot the victim.

At the trial Schader testified that he and Turner were merely surveying the market for a robbery which they had planned to commit later in the evening after they had left the market and returned at about the closing time. Schader further testified that at the time of the shooting, he did not

know that Turner had committed the robbery and that he did not know that the victim was a police officer. He said that the officer grabbed him with one arm while holding a weapon in the other hand. He contended that he shot the victim accidentally during this struggle.

Schader attacked the confession at the trial on the ground that it had been procured by coercion. Conducting a *voir dire* hearing in the presence of the jury, the trial judge determined that the confession was voluntary. He told the jurors that they should not consider a confession if they found it involuntary or if they determined that a defendant had requested and had been denied counsel prior to giving it. The judge also instructed the jurors not to consider the confession of one defendant against the other defendant.

(1) Defendants contend that their arrest without a warrant was not based upon reasonable cause and that the subsequent search of the Cadillac was illegal, rendering the physical evidence obtained by the search and their later confessions inadmissible. On the other hand, the People contend that the arrest rested upon reasonable cause and that the search was incidental thereto.

█ Reasonable cause exists when the facts and circumstances within the knowledge of the officer ". . . at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense had been committed. *Carroll* v. *United States,* 267 U.S. 132, 162 [45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790]." (*Beck* v. *Ohio* (1964) 379 U.S. 89, 96 [85 S.Ct. 223, 13 L.Ed.2d 142].) In *Brinegar* v. *United States* (1949) 338 U.S. 160, 176 [60 S.Ct. 1302, 93 L.Ed. 1879], the court stated: "The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

█ The arresting officer had been advised by police radio that an officer had been killed during the course of a robbery and that the robbers were traveling easterly in a late model red Cadillac. Shortly thereafter he saw such a car proceeding in the given direction. In addition, the officer stated that he believed the youthful appearance and informal dress of the driver of the car presented a suspicious circumstance. Also, the speed of the Cadillac was reduced when the officer began following it.

Defendants argue that the dress and age of the driver and the reduction in speed were not unusual and should not be given any weight in determining reasonable cause. Aside from these particular circumstances, however, the officer had ample reason to stop the vehicle and arrest the occupants.

Defendants urge that, at most, the officer had cause to stop the vehicle for investigation. They note that the officer had information that the getaway car had two suspects in it; this car had only one person visible to the officer. With the information that one police officer had already been slain, however, Officer Morris was under no compulsion to investigate further before making an arrest. His immediate duty was to arrest the driver of the suspect vehicle, disarm him of any weapons, with a minimum of risk to his own personal safety, and proceed with his investigation.

Defendants rely upon *People* v. *Mickelson* (1963) 59 Cal.2d 448 [30 Cal.Rptr. 18, 380 P.2d 658]. The circumstances held in *Mickelson* to be insufficient to warrant the search of closed baggage in a vehicle are readily distinguishable from the circumstances which faced the officer in the instant case.

This court held in *Mickelson* that although it was not unreasonable for the officer to stop the car for investigation and to take reasonable precautions for his own safety, he did not have probable cause to arrest the driver. We stated: "There could have been more than one tall white man with dark hair wearing a red sweater abroad at night in such a metropolitan area. Although [the driver] was in the vicinity of the robbery, he was not observed until about 20 minutes after it occurred when he was driving toward the scene of the crime, not away from it. The officer had no information that the robber had an automobile or a confederate. The erratic route of the car and defendant's movement in the seat were at most suspicious circumstances. The officer's investigation elicited identification upon request and a story consistent with the movements of the car and the officer's own assessment of those movements. Both occupants were out of the car away from any weapons that might have been concealed therein. Instead of interrogating [the driver] and defendant with respect to the robbery or requesting them to accompany the officers the few blocks to the market for possible identification, the officer elected to rummage through closed baggage found in the car in the hope of turning up evidence that might connect [the driver] with the robbery." (*Id.* at p. 454.) Thus, we held that the "search exceeded the bounds of reasonable

investigation. It was not justified by probable cause to make an arrest, and it cannot be justified by what it turned up.'' (*Ibid.*)

Defendants assert that, as in *Mickelson,* where there could have been more than ''one tall white man with dark hair wearing a red sweater abroad at night in such a metropolitan area,'' here there could have been more than one late model red Cadillac on the Roseville freeway at the time of defendants' arrest.

Significant factors, however, distinguish *Mickelson* from the instant case. In *Mickelson* the arresting officer did not know that the robber had an automobile, whereas in the instant case the arresting officer was informed that the robbers were escaping in a red Cadillac. In *Mickelson* the automobile was proceeding in the direction of the scene of the crime; in the instant case, defendants were driving in the direction reported, away from the scene of the crime. The added elements of the close proximity in time and of the officer's knowledge that one of the culprits had killed another officer in the robbery likewise differentiate the instant case from *Mickelson.*

In attributing significance to the latter factor, we note the pertinence of the language of Mr. Justice Jackson in his dissenting opinion in *Brinegar* v. *United States, supra,* 338 U.S. 160, 182: ''Undoubtedly the automobile presents peculiar problems for enforcement agencies, is frequently a facility for the perpetration of crime and an aid in the escape of criminals. But if we are to make judicial exceptions to the Fourth Amendment for these reasons, it seems to me they should depend somewhat upon the gravity of the offense. If we assume, for example, that a child is kidnaped and the officers throw a roadblock about the neighborhood and search every outgoing car, it would be a drastic and undiscriminating use of the search. The officers might be unable to show probable cause for searching any particular car. However, I should candidly strive hard to sustain such an action, executed fairly and in good faith, because it might be reasonable to subject travelers to that indignity if it was the only way to save a threatened life and detect a vicious crime. But I should not strain to sustain such a roadblock and universal search to salvage a few bottles of bourbon and catch a bootlegger.'' (See *McDonald* v. *United States* (1948) 335 U.S. 451, 459 [69 S.Ct. 191, 93 L.Ed. 153] [Jackson, J., concurring] ; Rest., Torts (1934) § 119, com. j.) Officer Morris was entitled to protect himself from the dangers that befell Officer

McKnight; thus the officer while conducting the investigation had the right to arrest defendant. ██ Under such circumstances as faced this officer, society must risk the arrest of suspects who are innocent rather than subject officers to needless hazards in effecting the arrest of suspected armed murderers.

Finally, in *Mickelson* we stated that it was reasonable for the officer to stop the car and to take reasonable precautions for his safety, but we condemned the search of the closed baggage which proceeded in the absence of the officers' interrogation or identification of the suspects or any other circumstance justifying the search. ██ In the instant case, after the officer stopped the car and took reasonable precautions for his safety, it became apparent that another person was hiding in the car, especially after Schader said, "It looks like they've got us, Turner." This suspicious circumstance certainly justified further investigation. Furthermore, the stolen money and weapons were on the front seat of the car; it does not appear that the officer rummaged through closed baggage as in *Mickelson*.

Defendants also rely upon *Henry* v. *United States* (1959) 361 U.S. 98 [80 S.Ct. 168, 4 L.Ed.2d 134]. In that case federal agents investigating a theft from an interstate shipment of whiskey observed twice on the day after the theft defendant and another man placing cartons in an automobile in a residential area near the scene of the crime. Seeing these events from a distance of 300 feet the agents could not determine the size, number or contents of the cartons. The agents then arrested the two men; a search disclosed that the defendant possessed stolen radios. The United States Supreme Court in reversing the judgment held that the agents arrested the defendants without probable cause. The court said, "The fact that packages have been stolen does not make every man who carries a package subject to arrest. . . . The police must have reasonable grounds to believe that the particular package carried by the citizen is contraband. Its shape and design might at times be adequate. The weight of it and the manner in which it is carried might at times be enough. But there was nothing to indicate that the cartons here in issue probably contained liquor." (*Id.* at p. 104.)

██ The instant case presents a situation distinguishable from that in *Henry*. In *Henry*, on the day after the theft the "outwardly innocent" (*Id.* at p. 103) acts in question took place in a residential area where such transactions were not

necessarily expected and where the agents themselves could not see if the observed items resembled the contraband. In the instant case, shortly after the robbery, the officer observed a car proceeding in the reported direction matching the description of the car that left the scene of the crime. Furthermore, the types of crimes involved in the two cases practically parallel those used in the example cited by Mr. Justice Jackson in his argument for considering the offense in deciding the legality of a search or an arrest.

We have recognized that no exact formula can fix the reasonableness of an arrest and that each case must be decided on its own facts. (*People* v. *Ingle* (1960) 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577].) Under the circumstances of this case the arresting officer had reasonable cause for making the arrest and incidental search.

(2) The application of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado* (1965) *ante,* p. 338 [42 Cal.Rptr. 169, 398 P.2d 361], is at issue in this case. In *Escobedo,* the United States Supreme Court held that in admitting into evidence a statement elicited from a suspect during the accusatory stage, even though prior to arraignment, the court committed error since the suspect had requested and had been denied counsel before making the statement. In *Dorado,* we held that ''defendant's confession could not properly be introduced into evidence because (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights.'' (*Ante,* at pp. 353-354.)

The accusatory stage, or that stage at which the right to counsel accrues, matures when two conditions eventuate: ''when the officers have arrested the suspect and the officers have undertaken a process of interrogations that lends itself to eliciting incriminating statements. . . .'' (*People* v. *Stewart* (1965) *ante,* pp. 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97].) Defendants confessed several hours after they had been arrested and taken to the police station; at the station the police interrogated them and placed them in lineups; the police possessed substantial evidence indicating the guilt of defendants. Under these circumstances the process of

interrogation lent itself to eliciting incriminating statements. (*Id.* at p. 579.) Hence, both defendants confessed during the accusatory stage.

Defendant Schader argued at trial that he had requested and had been denied counsel before he confessed; that, as a consequence, the confession should not have been introduced into evidence. On the other hand, the investigating officer, Kunz, testified that defendant made no such request. As we have noted, the judge instructed the jury not to consider the confession if the defendant had requested but had been denied counsel. The judge reached no preliminary determination regarding this issue, and the record does not disclose whether or not the jury rejected the confession.

 If defendant did request counsel but counsel had been denied, then the confession was inadmissible under *Escobedo*; if he did not request counsel his confession still remained inadmissible under *Dorado* since the record does not indicate that defendant, prior to his confession, had been advised of his rights to counsel and to remain silent or had otherwise waived those rights. We cannot presume such a waiver from a silent record. (*People* v. *Stewart* (1965) *ante,* pp. 571, 581 [43 Cal.Rptr. 201, 400 P.2d 97].)

 Accordingly, we hold that the trial court erroneously admitted into evidence defendant Schader's confession. Likewise, since the record does not show that defendant Turner had been advised of his rights to counsel and to remain silent or that he had otherwise waived those rights, his confession should not have been admitted into evidence.

 Just as the trial judge should find that a confession is voluntary before it may be admitted (*Jackson* v. *Denno* (1964) 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908]; see *People* v. *Gonzales* (1944) 24 Cal.2d 870, 876-877 [151 P.2d 251]), he should find, before admitting the confession, that it was not obtained in violation of defendant's right to counsel. The necessity for such a procedure is illustrated by our uncertainty in the instant case as to the jury's disposition of the right to counsel issue and consideration of the confession.

In *Jackson* v. *Denno, supra,* 378 U.S. 368, the United States Supreme Court held that if a judge submitted the issue of the voluntariness of the confession to a jury without first determining that it was voluntary, such a procedure would not satisfy the due process requirements that questions of voluntariness be reliably determined and that convictions not be based on involuntary confessions. The court pointed out that

it is impossible to determine how the jury resolved the question of voluntariness and to know whether or not the confession influenced the decision.

The same difficulties which beset the admissibility of a confession procured by coercion pertain to the admissibility of a confession obtained in derogation of defendant's right to counsel. We do not know if the jury actually reached separate and definite conclusions as to (1) whether defendant Schader, prior to confession, requested and was denied counsel, or (2) whether he was advised of his rights to counsel and to remain silent, or (3) whether he otherwise waived those rights. In such a situation we inevitably incur the danger that the jury might have returned "an unanalytical and impressionistic verdict based on all they had heard." (*Stein* v. *New York* (1953) 346 U.S. 156, 177-178 [73 S.Ct. 1077, 97 L.Ed. 1522]; see 78 Harv.L.Rev. (1964) 143, 211.)

Furthermore, if the jurors did find that the confession was obtained in violation of defendant's right to counsel, we do not know if they nevertheless disregarded the violation. ▮ Thus, in order to insure that the issue of whether the confession was obtained in violation of defendant's right to counsel will be reliably determined and to insure that a conviction does not rest upon an improperly obtained confession, the trial judge should decide these issues of admissibility before permitting the jury to consider the confession.

▮ Once we have determined that an admission of an incriminating statement constitutes error, we must decide whether or not the error caused prejudice to defendant under article VI, section 4½ of the Constitution. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243].) ▮ The statements involved in the instant case, however, are confessions to murder in the first degree under the felony murder rule (Pen. Code, § 189) and to robbery in the first degree (Pen. Code, § 211a; see *People* v. *Fitzgerald* (1961) 56 Cal.2d 855, 861 [17 Cal.Rptr. 129, 366 P.2d 481]; Witkin, Cal. Evidence (1958) 275), and we have held that the erroneous admission of a confession is prejudicial per se and therefore compels reversal. (E.g., *People* v. *Stewart* (1965) *ante*, pp. 571, 581 [43 Cal.Rptr. 201, 400 P.2d 97]; *People* v. *Dorado* (1965) *ante*, pp. 338, 356 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Matteson* (1964) 61 Cal.2d 466, 469-470 [39 Cal.Rptr. 1, 393 P.2d 161]; *People* v. *Parham* (1963) 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]; *People* v. *Brommel* (1961) 56 Cal.2d 629, 634 [15 Cal.Rptr. 909, 364

P.2d 845]; *People* v. *Trout* (1960) 54 Cal.2d 576, 585 [6 Cal. Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; *People* v. *Berve* (1958) 51 Cal.2d 286, 290 [332 P.2d 97].)

The United States Supreme Court has uniformly stated that the introduction of an involuntary confession automatically requires reversal. (*Jackson* v. *Denno* (1964) 378 U.S. 368, 376 [84 S.Ct. 1774, 12 L.Ed.2d 908]; *Lynumn* v. *Illinois* (1963) 372 U.S. 528, 537-538 [83 S.Ct. 917, 9 L.Ed.2d 922]; *Rogers* v. *Richmond* (1961) 365 U.S. 534 [81 S.Ct. 735, 5 L.Ed. 2d 760]; *Payne* v. *Arkansas* (1958) 356 U.S. 560, 568 [78 S.Ct. 844, 2 L.Ed.2d 975]; *Stroble* v. *California* (1952) 343 U.S. 181, 190 [72 S.Ct. 599, 96 L.Ed. 872]; *Malinski* v. *New York* (1945) 324 U.S. 401, 404 [65 S.Ct. 781, 89 L.Ed. 1029].) The rationale for this rule rests upon the fact that if ''a coerced confession constitutes a part of the evidence before the jury and a general verdict is returned, no one can say what credit and weight the jury gave to the confession. And in these circumstances this Court has uniformly held that even though there may have been sufficient evidence, apart from the coerced confession, to support the judgment of conviction, the admission in evidence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment.'' (*Payne* v. *Arkansas* (1958) 356 U.S. 560, 568 [78 S.Ct. 844, 2 L.Ed.2d 975].) Moreover, as we stated in *People* v. *Parham* (1963) 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001], ''a confession will constitute persuasive evidence of guilt, and it is therefore usually extremely difficult to determine what part it played in securing the conviction. [Citations.] These considerations justify treating involuntary confessions as a class by themselves and refusing to inquire whether in rare cases their admission in evidence had no bearing on the result.''

 In determining the prejudicial effect of the illegally obtained confession at trial we are not concerned with the nature of the error that caused the illegality. The *reason* that the confession should not have been introduced into evidence is no longer material. As to its impact upon the jury and the prejudicial effect, the confession obtained in violation of defendant's right to counsel cannot be distinguished from the confession obtained in violation of defendant's right to be free of coercion.

In this inquiry we cannot logically distinguish between the different bases for the exclusion of the confession. It makes

no difference whether the confession was improperly obtained by physical brutality (*Brown* v. *Mississippi* (1936) 297 U.S. 278 [56 S.Ct. 461, 80 L.Ed. 682]; *People* v. *Jones* (1944) 24 Cal.2d 601 [150 P.2d 801]), by threats of physical abuses or severe punishment (*Payne* v. *Arkansas* (1958) 356 U.S. 560 [78 S.Ct. 844, 2 L.Ed.2d 975]; *People* v. *Underwood* (1964) 61 Cal.2d 113 [37 Cal.Rptr. 313, 389 P.2d 937]), by implied promises of lenience or probation (*People* v. *Quinn* (1964) 61 Cal.2d 551 [39 Cal.Rptr. 393, 393 P.2d 705]; *People* v. *Brommel* (1961) 56 Cal.2d 629 [15 Cal.Rptr. 909, 364 P.2d 845]), by the officer's promise to release defendant's wife or relative upon defendant's confession (*People* v. *Trout* (1960) 54 Cal.2d 576 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; see *People* v. *Matlock* (1959) 51 Cal.2d 682, 697 [336 P.2d 505, 71 A.L.R.2d 605]), or by retention of the defendant incommunicado (*Haynes* v. *Washington* (1963) 373 U.S. 503 [83 S.Ct. 1336, 10 L.Ed.2d 513]). It is immaterial whether the confession should have been excluded as the fruit of an illegal arrest or illegal search (*Wong Sun* v. *United States* (1963) 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441]; see *Fahy* v. *Connecticut* (1963) 375 U.S. 85, 91 [84 S.Ct. 229, 11 L.Ed. 2d 171]); or whether the admission of a confession was improper because it was given after a refusal to allow defendant to consult with counsel (*Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]) or after an interference with his right to counsel (*Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246]) or because it was given by defendant without advice of his rights to counsel and to remain silent (*People* v. *Dorado* (1965) *ante,* p. 338 [42 Cal.Rptr. 169, 398 P.2d 361]; *Clifton* v. *United States* (1965) 341 F.2d 649; *State* v. *Neely* (Ore. 1965) —— Ore. —— [398 P.2d 482]; *State* v. *Dufour* (R.I. 1965) —— R.I. —— [206 A.2d 82, 85]). After holding that the confession should not have been admitted, we can only be concerned with the effect of the confession upon the jury's deliberation, regardless of the type of error involved. It is because of the effect of the confession that the reversal is compelled.

The argument that an illegally obtained confession should be differently treated if it is "voluntarily" rendered cannot stand. To argue that a "voluntary" confession is more apt than an "involuntary" one to be trustworthy and *therefore* its *effect* upon the jury is different is to rest upon a non sequitur. It is again to confuse considerations as to inadmissibility of a confession with its *effect* upon a jury. In

either case the confession operates as a kind of evidentiary bombshell which shatters the defense. Indeed, the United States Supreme Court has rejected the contention that the alleged "trustworthy" quality of an involuntary confession saves the judgment because of the presence of independent corroborating evidence. (*Rogers* v. *Richmond* (1961) 365 U.S. 534 [81 S.Ct. 735, 5 L.Ed.2d 760].)

Since we have concluded that the trial court should not have admitted the confessions, we need not consider other contentions urging their inadmissibility.

 (3) Defendants contend that a second-degree murder instruction should have been given. If Schader's testimony is believed, he would not be guilty of first degree murder under the felony murder rule (Pen. Code, § 189), but he could still be found guilty of second degree murder; accordingly, the judge committed error in not instructing the jury on second degree murder.

Schader testified that he was investigating the market and was involved in a conspiracy to rob it at a later time, but was unaware that the robbery had taken place or that the victim was attempting to apprehend him or Turner. A killing committed during a conspiracy to commit robbery does not come within the terms of section 189 unless that killing was committed "in the perpetration or attempt to perpetrate . . . robbery. . . ." (Pen. Code, § 189.) If a killing is so committed, even accidentally, all coconspirators are guilty of first degree murder. (*People* v. *Boss* (1930) 210 Cal. 245 [290 P. 881].) But death must result from an act committed in furtherance of the robbery or the escape from such robbery. *People* v. *Ferlin* (1928) 203 Cal. 587, 597 [265 P. 230]; see *People* v. *Ketchel* (1963) 59 Cal.2d 503, 523-524 [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Kauffman* (1907) 152 Cal. 331, 334 [92 P. 861].)

If Schader did not know that the robbery had occurred or that the police officer was seeking to apprehend either Turner or himself for a robbery, Schader at the time of the killing was not perpetrating or attempting to perpetrate a robbery. If such were the case, it is immaterial, insofar as the felony murder doctrine is concerned, that Turner had just committed a robbery for which Schader would be liable as a coconspirator or that Schader would also have been guilty of first degree murder if Turner had killed in the commission of the robbery.

If Schader's testimony is believed, the killing he committed had no relationship to the planned robbery except that it oc-

curred during the time of the conspiracy's existence. The killing was not committed in the perpetration of the robbery, just as it would not have been so committed if Schader had killed at a different time and place accidentally or for a purpose personal to himself while, unknown to him, a coconspirator was engaged in a previously planned robbery. Admittedly, the fact that the killing occurred in such close proximity in time and space to the robbery casts doubts on the truth of Schader's testimony that they were unrelated, but if the jury believed his testimony they could not find defendants guilty of murder in the first degree.

The jury could, however, still convict Schader of second degree murder. ▮▮▮ A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life, other than the six felonies enumerated in Penal Code section 189, may constitute second degree murder. (*People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892].) ▮▮▮ The killing in the instant case took place while Schader was in the process of committing a felony by violating Penal Code section 12021, which prohibits the possession of a concealed firearm by any person who has previously been convicted of a felony. We have held that one who kills a person while violating this provision may be convicted of second degree murder. (*People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892]; *People* v. *Robillard* (1960) 55 Cal.2d 88, 98 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].)

The failure to instruct a jury on the basis of defendant's evidence constitutes prejudicial error. (*People* v. *Jeter* (1964) 60 Cal.2d 671 [36 Cal.Rptr. 323, 388 P.2d 355]; *People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281].) This error also prejudiced defendant Turner, for Turner's conviction on the murder count may have been predicated on Schader's improper conviction. (*People* v. *Jeter, supra,* p. 676.)

We need not discuss defendant Schader's contention that the trial court should have given instructions on manslaughter and self-defense despite the contrary expression of his counsel since Schader's counsel may request these instructions at the new trial.

▮▮▮ (4) Two pictures of decedent's body were admitted over the objections of defendants. These were morgue photographs in color and were used to show the point of entry of the bullet and the area where it came to rest. The photo-

graphs were also offered in connection with expert testimony designed to show the distance between the victim and the weapon used to kill him at the time it was fired. The pictures showed a considerable amount of blood and were unpleasant to view, but they did have evidentiary value; the question whether such value outweighed any possible prejudicial effect rested within the sound discretion of the trial court. (*People* v. *Arguello* (1964) 61 Cal.2d 210, 213 [37 Cal.Rptr. 601, 390 P.2d 377]; *People* v. *Henderson* (1963) 60 Cal.2d 482, 495 [35 Cal.Rptr. 77, 386 P.2d 677].) We find no abuse of discretion in the admission of the photographs.

The convictions must be reversed upon the erroneous admission of the confessions and the failure of the trial judge to give an instruction on second degree murder.[1]

The judgments are reversed.

Traynor, C. J., Peters, J., and Peek, J., concurred. .

BURKE, J.—I dissent from the reversal of the judgment of convictions of the defendants for first degree murder and robbery.

The majority bases its reversal upon the admission into evidence of certain admissions and confessions obtained from the defendants without their having been advised of their constitutional rights to counsel and to remain silent, based upon this court's decision in *People* v. *Dorado, ante,* p. 338 [42 Cal.Rptr. 169, 398 P.2d 361]. As noted in my dissent in *Dorado,* concurred in by Mr. Justice Schauer, assuming that there was error in the admission of the confession the mandate of section 4½ of article VI of the California Constitution requires this court to review "the entire cause, including the evidence" to determine whether "the error complained of has resulted in a miscarriage of justice" and whether there is a reasonable probability that a result more favorable to the defendant would have been reached had the error not been committed. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

A review of the evidence indicates that there were independent eyewitnesses to both the robbery and the shooting of the policeman and positive identification of the defendants.

---

[1] We do not discuss the trial court's instruction bearing on the failure of defendant Turner to testify since we reverse on other grounds. (See *Griffin* v. *California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106].)

The defendants were caught fleeing the scene of the crime with the stolen money and the weapons used in the perpetration of the crime in their possession. Furthermore, Schader, who did the shooting, took the stand at the trial and admitted his part in the planning of the robbery and the shooting, claiming that the gun went off accidentally. In the face of this evidence it is inconceivable that the jury would have reached a result more favorable to the defendants had the admissions and confessions under attack been omitted from the evidence.

Under the holding of *Dorado,* the improper admission of such statements and confessions, found to have been voluntarily given, is placed in the same category as the admission of an involuntary confession and the effect upon the jury is deemed prejudicial as a matter of law compelling reversal. I believe this holding in *Dorado* to have been error and that the prejudice which results from the use of an improperly received *voluntary* confession is not necessarily the same as that which the Supreme Court of the United States has held to result from the use of an *involuntary* confession.

"Involuntary confessions are excluded because they are untrustworthy, because it offends 'the community's sense of fair play and decency' to convict a defendant by evidence extorted from him, and because exclusion serves to discourage the use of physical brutality and other undue pressures in questioning those suspected of crime. (*People* v. *Berve,* 51 Cal.2d 286, 290, 293 [332 P.2d 97]; see *Watts* v. *Indiana,* 338 U.S. 49, 54 [69 S.Ct. 1347, 1357, 93 L.Ed. 1801]; *Lyons* v. *Oklahoma,* 322 U.S. 596, 605 [64 S.Ct. 1208, 88 L.Ed. 1481].) All these reasons for excluding involuntary confessions apply to involuntary admissions as well. (See *Opper* v. *United States,* 348 U.S. 84, 90-92 [75 S.Ct. 158, 99 L.Ed. 101]; Falknor, *The Hearsay Rule and Its Exceptions,* 2 U.C.L.A. L.Rev. 43, 68.)" *People* v. *Atchley* (1959) 53 Cal. 2d 160, 170 [346 P.2d 764].)

For these reasons both this court and the Supreme Court of the United States, as pointed out in *Dorado,* have declared that the use of an *involuntary* confession results in a denial of due process and requires reversal "regardless of other evidence of guilt." (See cases cited in *People* v. *Dorado, supra, ante,* at p. 356.) However, a *voluntary* confession does not suffer the disabilities of an involuntary one. A voluntary confession[1] is normally trustworthy, it does not offend "the com-

---

[1]"Confessions . . . are called voluntary when made neither under the influence of hope or fear, but are attributable to that love of truth

munity's sense of fair play and decency" because it has not been the product of coercion or force, and its exclusion does not serve to discourage improper police tactics.

Although the admission in evidence of a voluntary confession was held to compel reversal under the particular circumstances present in *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *Dorado,* it does not follow that voluntary confessions should be equated with involuntary confessions and admissions regardless of the circumstance of the particular case.

The exact wording of the California Constitution itself (art. I, § 13) is significant: "In criminal prosecutions, . . . [no] person shall be . . . *compelled* . . . to be a witness against himself; . . ." (Italics added.)

The compulsory is the antithesis of the voluntary; the voluntary negates compulsion. So, in the instant case, those admissions offered by Schader and Turner intending that they be exculpatory, but which must be interpreted as confessions, must be distinguished from statements made under compulsion. They, too, are condemned by the *Escobedo* and *Dorado* rules, but their admission into evidence should not result in automatic reversal notwithstanding that it constituted prejudicial error. As so well stated by Justice Schauer in his concurring and dissenting opinion in *People* v. *Hillery,* Crim. No. 7320, *ante,* pp. 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382] "Our Constitution (section 4½, clarifying and limiting section 4 of article VI, as made clear by the circumstances preceding and surrounding its adoption on October 10, 1911, in its then form applicable only to criminal case appeals) peremptorily forbids this court to reverse for mere *error* 'as to any matter of pleading or . . . procedure,' *whether prejudicial or otherwise,* '*unless,* after an examination of the entire cause, including the evidence, the court shall be of the opinion that *the error complained of* has resulted in a miscarriage of justice.' " Applied in the instant case an affirmance of the convictions of Schader and Turner is required. A *reversal,* as Justice Schauer aptly expresses it, would itself work a miscarriage of justice.

Because of the essential differences between the two types of confessions, it was illogical to state categorically, as did

which predominates in the breast of every man, not operated upon by other motives more powerful with him, and which, it is said, in the perfectly good man, cannot be countervailed." (*State* v. *Anderson* (1935) 208 N.C. 771 [182 S.E. 643, 651].)

this court in *Dorado,* that in every instance the use of an illegally admitted voluntary confession compels reversal, regardless of whether under the application of article VI, section 4½, it may be said that in a particular case the admission of such confession in evidence did not result in a miscarriage of justice.

This court has found no such compulsion with respect to other evidence secured in violation of other provisions of the federal and state Constitutions. For example, this court has held that the admission of evidence obtained as a result of an illegal search in violation of constitutional guarantees, will not result in reversal unless on the entire record of the case the reviewing court concludes a miscarriage of justice has resulted. *(People* v. *Cruz* (1964) 61 Cal.2d 861, 867 [40 Cal.Rptr. 841, 395 P.2d 889] ; *People* v. *Parham* (1963) 60 Cal.2d 378, 385, 386 [33 Cal.Rptr. 497, 384 P.2d 1001].) Also, the court did not find itself compelled to reverse a conviction in *People* v. *Hillery, supra, ante,* p. 692, a case in which it found the trial court committed error in receiving in evidence certain voluntary admissions which fell short of being a confession. *(People* v. *Dorado, supra, ante,* at p. 356.)

The latter cases reflect the proper application of article VI, section 4½, and of the supplemental rule of this court as to the test to be applied in determining whether such an error in the admission of evidence compels reversal, namely, whether after the mandatory review of the entire cause, including the evidence, the reviewing court is of the opinion that it is reasonably probable that a result more favorable to the defendant would have been reached if the subject evidence had not been erroneously admitted against him. *(People* v. *Watson, supra* (1956) 46 Cal.2d 818, 836.)

I would affirm the convictions of the defendants for first degree murder and robbery.

McComb, J., and Schauer, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.