[Crim. No. 14248. Second Dist., Div. Four. May 29, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. J. P. TROTTER, JR., Defendant and Appellant.

Richard H. Levin and Donald F. Roeschke, under appointments by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Robert T. Jacobs, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—Defendant was charged, jointly with Charles Perry, Willard McKinney and Joe Monk, with armed robbery in violation of section 211 of the Penal Code. They pled not guilty. After a trial by jury, they were convicted as charged; probation was denied and they were sentenced to state prison. Defendant and Perry appealed.

Originally we appointed Mr. Roeschke to represent both appellants. Thereafter, at defendant's request for separate counsel, we relieved Mr. Roeschke from further representation of defendant (retaining him as appointed counsel for Perry), and appointed Mr. Levin to represent defendant.

Because Mr. Roeschke's brief on behalf of Perry raised an issue not available to this defendant, we severed the appeals and, in an unpublished opinion filed on February 26, 1969, we reversed the judgment as to Perry on the ground that the evidence, assuming its admissibility, was insufficient to support the verdict as to him. As will hereinafter appear, Trotter cannot urge the issue of insufficiency of the evidence and we proceed to consider the objections raised on his behalf in this appeal. In so doing we have considered not only the points raised by Mr. Levin but, so far as applicable, those raised on his behalf in Mr. Roeschke's earlier brief.

As a background to that discussion, we repeat the basic story of the crime and of the arrest of defendant as we gave it in the *Perry* opinion: "At about 10:15 p.m., Alexander Poltash was alone in charge of a take-out restaurant in Lawndale. A Negro man (subsequently identified as Trotter) approached

the window of the establishment and, after purporting to order a pizza, pulled out a pistol, pointed it at Poltash, and demanded 'all of the money.' At that moment two other Negro men (one of whom was subsequently identified as Monk) entered the establishment by a back door. Poltash put approximately $100 in bills and change in a bag which he gave to Trotter. The other two men took Poltash outside and ordered him to run down the alley. He ran, as directed, for a short distance and then returned. The men were gone; he did not see how they left and did not know whether or not they left in an automobile. Poltash called the police and gave a description of Trotter.

"At about 11:00 p.m., that same evening, Officer Pate of the Compton police was directed by radio to investigate a suspicious vehicle in the vicinity of a drive-in at Santa Fe and Rosecrans—approximately eleven and one-half miles from the robbed establishment. After watching the suspected vehicle for a short time, Officer Pate and his partner stopped it, searched it and its passengers, who were the four men herein charged. McKinney was driving, Monk was in the passenger side on the front seat, Trotter was seated behind the driver and Perry behind Monk. A pistol was found at Monk's seat and two other pistols were under the rear part of the front seat. Ammunition was found on Trotter. The men were arrested for suspicion of robbery (the officers had no knowledge, at that time, of the Poltash robbery) and for illegal possession of a weapon. When they were booked, and their property inventoried, they had, among them, a total of $138.35 divided as follows:

| | | |
|---|---|---|
| McKinney | $29.29 | (3 $5.00 bills; 13 $1.00 bills; 5 quarters; 4 pennies) |
| Monk | $56.92 | (1 $20.00 bill; 1 $10.00 bill; 2 $5.00 bills; 15 $1.00 bills; 7 quarters; 1 dime; 1 nickel; 2 pennies) |
| Trotter | $26.30 | (1 $10.00 bill; 1 $5.00 bill; 8 $1.00 bills; 9 quarters; 18 nickels; 15 pennies) |
| Perry | $25.84 | (1 $10.00 bill; 1 $5.00 bill; 8 $1.00 bills; 10 quarters; 2 dimes; 2 nickels; 4 pennies) |

"No witness except Poltash testified as to the circumstances of the robbery. As we have indicated, he saw only three men and could identify only two of them—Trotter and Monk."

542

I

 It is contended that the action of the Compton police in stopping the car and in thereafter searching it and its occupants was illegal and that the evidence thereby secured was inadmissible. We do not agree.

The officer had received, over his police radio, both certain information and a direction to investigate a described car. The information given to him was (according to his testimony) as follows:

"A. Yes. At approximately 11:00 o'clock I received a radio broadcast to the units in the field via the police radio of a vehicle, a suspicious vehicle in the vicinity of the Jack-in-the-Box, which is a drive-in located at Santa Fe and Rosecrans.

"This vehicle was described as a '63, '64 gray or light blue Ford containing two male Negroes and two female Negro subjects.

"The license JRV 805 was given as to the license plate on this particular vehicle.

" . . . . . . . . . . . .

"Q. By MR. LEGG: Were you given any other information about this vehicle via that police radio?

"A. Yes. Information was received that the vehicle was observed to park on the west side of Rosecrans. Correction. West side of Santa Fe, just north of Rosecrans. Two persons got out from this vehicle, walked across the street to the drive-in, stand by the window. A customer observed to come up. These two people left the area, came back to the automobile. They sat for a while. They went back after the customer had left. They went back to the drive-in. Then they returned back to the vehicle and left the area." The officer went to the general area involved, saw a car with the license number given to him, verified the number over his police radio, and stopped the car.[1] As it pulled over, the officer saw the driver reach down with his right hand, apparently placing something on the car floor.[2] When the officer approached the car to check

---

[1] The car was compelled to stop because it had reached an intersection where its progress was blocked by a passing train.

[2] "Q Now, did you notice anything ususual about the actions of the passengers?

"A No, not particularly of the passengers. I noted that the driver in the process of stopping his vehicle made a movement as if he were hiding or attempting to hide something within the vehicle.

"Q Well, can you show us; can you demonstrate what you saw?

"A Well, sitting in the vehicle this way, as a driver—first, he bent first over this way with his arm dropping down this way, straightened up, then this arm went down, this right here, then the stop was made.

"[Witness demonstrating.]"

the driver's identification, he saw the barrel of a pistol sticking out from under Monk's leg. He then ordered Monk, and later the other men, out of the car and searched them and the car, finding the other pistols and ammunition.

Both parties cite our opinion in *People* v. *Stephenson* (1969) 268 Cal.App.2d 908 [74 Cal.Rptr. 504]. It is true here, as we said there, that the mere fact of approaching a drive-in window and leaving without making a purchase is not, in and of itself, a "suspicious circumstance" justifying the stopping and interrogation of that person. But it is also true here, as it was in *Stephenson*, that that fact did not stand alone. Here there was not one, but two, abortive approaches to the drive-in window, and there was the movement by the driver. ██ As we said in *Stephenson*: "The accepted guideline for temporary stopping for questioning is whether a reasonable man in the same circumstance would believe such conduct necessary to a proper discharge of duties. (*People* v. *Perez* (1966) 243 Cal.App.2d 528, 531 [52 Cal. Rptr. 514].) ██ The strength of the information an officer should have to engage in questioning is necessarily much less than it would be for an arrest. (*People* v. *Currier* (1965) 232 Cal.App.2d 103, 106 [42 Cal.Rptr. 562].) ██ The Supreme Court 'stop and frisk' cases, as summarized in *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], have not abolished the California rule permitting a temporary detention for questioning where the officer can point to reasons beyond a mere hunch, for questioning the suspects." (268 Cal.App.2d 908, 910-911.) ██ Once the car had stopped and the officer had seen the gun muzzle under Monk's leg, his right to proceed thereafter is clear.

We should point out that, except for the fact that the stopping, searching and arrest ultimately led to defendant's prosecution for the Poltash robbery, the evidence secured at the time of arrest was of little, if any, probative value in the case. The money found cannot be said to have been shown to be the fruits of the Poltash crime[3] and, although Poltash ultimately identified one of the pistols found as being the *one* used by the man who first held him up, the record does not

---

[3]As we said in the *Perry* opinion: "Clearly, the money found on the men cannot be identified as the loot of the Poltash robbery—it exceeds that total by almost $40; it clearly included one bill (the $20 found on Monk) which was not part of the proceeds of that robbery; and the distribution scarcely suggests a four-way division of the money there taken."

clearly show that the pistol identified was the one found at defendant's feet.[4]

## II

■ Since the arrest and identification of defendant preceded the decisions in *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and in *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], it is immaterial that no counsel was present at the police lineup. The objection urged on us is that the lineup, viewed in the light of the police conduct that preceded it, was constitutionally unfair. According to Mr. Poltash, on the day after the robbery and arrest, he was called on the telephone and asked to come down to the Compton station. His version (not contradicted) of that call was as follows: "*They said they have the guys that did it,* and go down and identify to see if it is the ones.'' (Italics added.) The lineup consisted only of the four men arrested as above described and jointly tried here. When Poltash reached the station, the officer conducting the lineup said: "Do you recognize any of those guys?" Poltash identified defendant and Monk; he did not, then or later, identify the other two men (Perry and McKinney).

While, as the Attorney General points out, there was nothing suggestive in the language used *after* Mr. Poltash reached the police station, he could hardly have remained unaware of the earlier and positive statement that the men he was about to see were the men who had robbed him. The lineup itself was also suggestive. Poltash had seen three men during the holdup; as his testimony indicates, he suspected that there had been one more. He was shown four men, and four men only. While we recognize that such a lineup is not always unconstitutionally unfair, yet, when it is coupled with the suggestive introduction here present, the cumulative effect is such as to render the entire procedure illegal.

However, that conclusion need not compel a reversal. In spite of the suggestive nature of the lineup, Poltash identified only two out of the four men[5] and he testified that he made that identification because of the distinctive coats that they wore and, in the case of Trotter, because he had faced him, at the point of a gun, for four minutes while the robbery was in

---

[4]Poltash was shown two guns, one a .32 found at Trotter's feet and a .25 Rigarmi-Brescia. He identified one of them, referred to in the transcript only as ''This small automatic.''

[5]Since Poltash had seen only three men during the robbery, it is obvious that he could not, under any circumstances, have identified more than three at the lineup or at the trial.

progress. He had given the police, in his first report of the robbery, a description of Trotter which was accurate in its details. We are convinced, beyond a reasonable doubt, that the identification of Trotter was based on Poltash's independent recollection of him and that the identification at the lineup and in court was not influenced by the improprieties of the lineup procedure.[6]

### III

At the trial, Trotter and Monk were represented by the same public defender; the other two defendants each had separate counsel. It is now urged on us that this joint representation denied to Trotter his constitutional right of counsel.

Although no objection was made in the trial court to the joint representation, that does not foreclose Trotter from raising the point here. The right to counsel may be waived, but it can be waived only if the defendant knows of his rights and has made his waiver knowingly and intelligently. There is nothing in the record before us to show that Trotter, who was dependent on court-appointed counsel, knew that he could seek a different attorney from the one appointed for Monk. Under those circumstances, no waiver can be implied. (*People* v. *Chacon* (1968) 69 Cal.2d 765, 774 [73 Cal.Rptr. 10, 447 P.2d 106].)

However, the cases do not go so far as to require that there be separate counsel in every case even where not requested. The right exists only where there is at least a potentiality of a conflict of interest. Here, Poltash had identified Trotter and Monk. While it is possible that a cross-examination directed to that end might have resulted in Poltash identifying Monk as the first robber, we cannot see wherein that would have benefited Trotter. The evidence showed that both men had participated in the robbery; at the time of arrest, both men were in possession of pistols—Monk's was under his leg, Trotter's was at his feet. That a reversal of their roles in the holdup

---

[6] In *People* v. *Menchaca* (1968) 264 Cal.App.2d 642 [70 Cal.Rptr. 843], we reversed a case in which an in-court identification was arguably based on an illegal lineup. In that case we said: ''The record fails to show that the in-court identification of the defendant was based upon the victim's recollection of defendant at the time of the robbery and not on his subsequent identification at the time of the lineup.'' (*People* v. *Menchaca* (1968) 264 Cal.App.2d 642, 645 [70 Cal.Rptr. 843].) But, in the case at bench, as we point out above, the record does show affirmatively that the in-court identification was free of any taint from the lineup identification. Under these circumstances, there is no reason to require a hearing in the superior court on that issue and we need not reverse for such purpose.

would have resulted in a different verdict or in a different disposition seems impossible. We conclude that no reversible error appears in this case.

## IV

 It is argued that the trial court should have instructed the jury, on its own motion, that eyewitness identification is inherently weak. Although counsel cites respectable authority to the effect that eyewitness identification is frequently unreliable, he cites us to no case authority requiring that the jury be instructed on that topic. Until the Legislature, or some higher court, imposes such a rule, the weaknesses, if any, of such identification are for counsel to argue to the jury, not for the judge to proclaim.

## V

The verdict, and the judgment, contain a finding that defendant was armed, both at the time of the offense and at the time of his arrest. The finding that he was armed at the time of the offense must be stricken. (*People* v. *Sparks* (1967) 257 Cal.App.2d 306, 312 [64 Cal.Rptr. 682].) But there is no authority that requires us to strike the finding that he was armed at the time of his arrest. The first finding must be stricken; the second need not.

The judgment is modified by striking therefrom the finding that defendant was armed at the time of commission of the offense; otherwise the judgment is affirmed.

Files, P. J., and Jefferson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 23, 1969.