[Crim. No. 16307. Second Dist., Div. One. Dec. 5, 1969.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANCIS ANN TODD et al., Defendants and Appellants.

## COUNSEL

J. Howard Standing for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Lawrence K. Keethe, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**LILLIE, J.**—The trial court found Hughes and Todd (known as Maureen Bayle) guilty on separate counts of possession of marijuana (§ 11530, Health & Saf. Code) and jointly guilty of possession of restricted dangerous drugs (§ 11910, Health & Saf. Code), suspended the proceedings and granted them probation for five years. Both defendants appeal from the judgments (order granting probation).

Around 9:15 a.m. on February 19, 1968, while parked on his motorcycle with Officer Teague, Officer Sherlock observed Hughes drive past in a 1955 Mercury proceeding northbound on Vermont; with Hughes in the front seat were Todd and one Stone. He noticed the muffler and tail pipe bouncing up and down hitting the ground and no 1967 or 1968 tabs on the rear license plate; he turned on his red light and finally Hughes pulled over. As he walked to the driver's side the car kept rolling backwards; he asked Hughes what was wrong and if his emergency brake worked; Hughes replied there is "no emergency brake at all," and that the car did not belong to him. As Hughes reached over to turn off the ignition, Officer Sherlock noticed that the car did not have a standard type ignition—it was makeshift—the wind wing on the driver's side was broken and the rear seat was pulled out as though someone had broken into the trunk area. Asked for his driver's license, Hughes produced a Florida operator's license in the name of John Steward; when asked whose car it was, Hughes said it was a loan he was using while his was being fixed. There was no registration in the car, and Hughes said there was none; on the windshield was a red, faded emergency operation permit that had expired in September of 1967. Officer Sherlock testified, "I told him why I had stopped him and I then—in my own mind I thought this was a stolen car at that time"; he then motioned to Officer Teague that "there was something wrong."

In response to Officer Sherlock's motion Officer Teague, positioned to the right rear of the vehicle, walked up to the right front windshield and looked at the red faded, expired emergency permit when he noticed on the floor on the driver's side between the seat and the brake pedal a needle in a clear glass holder; he was approximately four feet away. He walked back to his motorcycle, picked up the radio and requested a "want" on the license plate, returned to the driver's side and retrieved the object which was a disposable-type needle. Meanwhile Officer Sherlock asked Todd and Stone to get out of the vehicle and for their identification, then proceeded to search for weapons. By then Officer Teague started to make "a cursory search" of Hughes. In order to do so he lifted up the back of a jacket which extended below Hughes' waist; he saw a black leather wallet in the left rear pocket of his tight-fitting blue levis and a bulge in the right rear pocket;

when he proceeded to put his hand on the bulge, Hughes jerked away saying, "You cannot search me without a warrant even if I have a gun." To Officer Teague the bulge resembled a gun and when Hughes jerked away, saying he could not be searched, it was his opinion that he and Officer Sherlock were in peril; thus he put Hughes' left hand behind his back, put his hand into Hughes' right rear pocket saying, "You better not have a gun there" and retrieved what turned out to be a Marlborough cigarette box with the top bent back; inside was marijuana and on top plastic bags containing what in his opinion was heroin. At this point Officer Teague informed Hughes and Stone they were under arrest for possession of heroin and possibly for grand theft auto. In the course of the search for weapons, Officer Sherlock had asked Todd for her purse but she jerked it away; thinking of possible weapons in the purse he forcibly took it from her but did not look in it and set it on the hood of the car. Then Officer Teague dumped the contents of her purse on the hood of the vehicle; his "thinking being possibly she also had a gun or a gun in her purse." He found among the contents desoxyephedrine, a handrolled marijuana cigarette and a secobarbital capsule. He also found desoxyephedrine in Hughes' left shirt pocket sometime after he discovered the Marlborough cigarette box. Subsequently he received a "no want" on the car; previously they had checked the "hot sheet" in their possession but the license number of the vehicle was not listed.

Hughes testified that upon disembarking from the vehicle he was subjected to a pat-down search at the conclusion of which one officer asked him what he had in his right rear pocket; he replied it was personal papers, personal property; the officer asked to see it and he told him he would have to have a warrant for his arrest or place him under arrest before he could have his personal things; the officer took it out of his pocket. He denied that he told the officer he could not search even if he had a gun in his pocket or said anything about a gun.

 Prior to trial defendants' motion under section 1538.5, Penal Code, was denied; the issue here relates to search and seizure. They argue that the evidence found on Hughes' person and in Todd's purse should have been suppressed. Appellants' contention that while the vehicle violated various Vehicle Code sections and the officers had good cause to stop Hughes to issue a citation, the initial contact was not sufficient to justify a cursory search for weapons, is based on the unsupported premise that there was no reason for the officers to believe the car was stolen, there was any criminal activity or that they were in peril.

 At the outset the officers stopped the Mercury because the muffler and tail pipe were bumping on the street and it lacked registration tabs on the rear license plate, but when they approached the stopped vehicle other

things of a suspicious nature became apparent to them (the vehicle had no emergency brake or registration and had a make-shift ignition, broken wind wing on the driver's side, a pulled out rear seat and a long expired emergency operation permit) and occurred (Hughes admitted the car was not his, produced only a Florida operator's license, admitted the car had no registration and claimed it to be a loan) which led the officers to believe there "was something wrong" and "the car was stolen." While the vehicle was not listed on the "hot sheet" in their possession (so many cars are listed as stolen, cars do not remain on the sheet more than one day) and they did not receive a "no want" on the vehicle until after the arrest, they thought "this was a stolen car at that time." In addition, in the process of looking at the expired emergency permit on the windshield, the officer saw on the driver's side on the floor a needle in a clear holder; based on his experience as a police officer and former hospital employee and familiarity with similar needles and apparatus, he suspected a narcotic involvement. Under such circumstances as faced this officer, he had cause to stop and interrogate Hughes. Thus the officers in the discharge of their duties were justified in making an investigation. (*People* v. *Schader*, 62 Cal.2d 716, 722-723 [44 Cal.Rptr. 193, 401 P.2d 665]; *People* v. *Trotter*, 273 Cal.App.2d 538, 543 [78 Cal.Rptr. 430]; *People* v. *Heard*, 266 Cal.App.2d 747, 751 [72 Cal.Rptr. 374]; *People* v. *Hawxhurst*, 264 Cal.App.2d 398, 401 [70 Cal.Rptr. 253].) At the same time Officer Teague proceeded to conduct a routine cursory search of Hughes for weapons; the pat-down search was proper. ■ If the circumstances warrant it, an officer may in self-protection make a superficial search for concealed weapons. (*People* v. *Mickelson*, 59 Cal.2d 448, 450-451 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Simon*, 45 Cal.2d 645, 650 [290 P.2d 531]; *People* v. *Heard*, 266 Cal.App.2d 747, 751 [72 Cal.Rptr. 374]; *People* v. *Hawxhurst*, 264 Cal.App.2d 398, 401 [70 Cal.Rptr. 253]; *People* v. *Davis*, 260 Cal.App. 2d 186, 189 [67 Cal.Rptr. 54].)

■ This search began as strictly a routine pat-down search for weapons starting at the waist, until the officer observed a bulge in Hughes' right rear pocket. Based on Hughes' conduct in jerking away from the officer when the officer tried to put his hand on the bulge and his provocative statement concerning "a gun," and the officer's belief that the bulge resembled a gun (he had previously seen guns of the same size and shape) Officer Teague formed the opinion that the bulge was a gun and he and his partner were in peril. Having reasonable cause to believe Hughes was in possession of a weapon, the officer had the right to direct him to surrender the same to him. (*People* v. *Fry*, 271 Cal.App.2d 350, 354 [76 Cal.Rptr. 718].) Here,

however, from defendant's statement "You cannot search me without a warrant even if I have a gun," Officer Teague could assume defendant would not deliver it to him and, for his own protection and that of Officer Sherlock, took the object from him. This, too, was proper. His good faith belief that the bulge might be a gun justified the seizure of the object even though it was not in fact a weapon. (*People* v. *Hawxhurst,* 264 Cal.App.2d 398, 403 [70 Cal.Rptr. 253].) Indicative of Officer Teague's good faith is Hughes' provocative statement about "A gun" when he proceeded to put his hand on the bulge and his own statement "You better not have a gun there" just before putting his hand into the pocket. ▮ If the search for weapons reveals contraband the officers are not required to ignore it. (*People* v. *Garrett,* 238 Cal.App.2d 324, 327 [47 Cal.Rptr. 731].)

The judgments, and each of them, are affirmed.

Wood, P. J., and Thompson, J., concurred.