[Crim. No. 4341. First Dist., Div. One. July 8, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. FRED PROPP, JR., et al., Defendants and Appellants.

Douglas G. Cowan and Willard E. Stone, under appointment by the District Court of Appeal, for Defendants and Appellants.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Edward P. O'Brien and Barry L. Bunshoft, Deputy Attorneys General, for Plaintiff and Respondent.

BRAY, J.*—After jury trial, defendant Propp wss convicted of the crimes of armed robbery in the first degree, conspiracy to commit robbery, possession of a sawed-off shotgun, and possession of concealed weapons. Defendant Wright was convicted of armed robbery in the first degree, conspiracy to commit robbery, and possession of certain firearms

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

by felon. Both defendants were adjudged habitual criminals.[1] Both defendants appeal. Although Propp was convicted of four crimes and defendant Wright of three, the court, feeling that all of the acts constituting the crimes were connected with the purpose and intent of the robbery charge, sentenced each defendant on the robbery charge only.

### QUESTIONS PRESENTED

A. Appeal of both defendants.

B. Appeal of defendant Wright.
 1. Sufficiency of the evidence.
 2. Alleged error in other instructions.

C. Application of the *Dorado* rule.
 1. Wright's statements to the police.
 2. Propp's statements.

D. Comment and instruction on failure to testify. (*Griffin* v. *California, infra.*)

### RECORD

Defendants were jointly charged in an information of violating sections 211 (robbery); 182 (conspiracy to commit robbery); 12021 (possession of concealed weapons by ex-convict) of the Penal Code.[2] A jury convicted both defendants of all charges.

About 10 p.m., September 16, 1962, Darrell Spicer, employed as a janitor at the LoRay Market, was about to enter the market by the front door. He observed Ray Anderson, another employee, walking down an aisle toward the front of the store, with his hands raised, followed by defendant Propp holding a gun at his back. Spicer left the front of the store and took up a position a short distance away. From there, he saw Propp force Lester Bryan, the assistant store manager, to open the safe. Spicer immediately ran to a nearby tavern and phoned the Richmond Police Department, informing them that there was a robbery in progress at the market. He described Propp as dark complected, slight of build, beady eyed and wearing a mask.

Officer Harold Hamil while on patrol received radio information of the robbery. He proceeded toward the market. As

---

[1] Defendants Propp and Wright each admitted six prior convictions.

[2] Wright was also charged jointly with Propp of violation of section 12020 (possession of sawed-off shotgun). This charge was dismissed as to Wright.

he approached the market he saw Propp running, carrying a sawed-off shotgun in one hand and a bag in the other. Hamil stopped his patrol car, got out, drew his revolver and ordered Propp to halt. This Propp did and was immediately arrested. A later examination of Propp revealed that he was wearing two pairs of pants, had a kerchief around his neck, and that the bag he was carrying contained about $5,000 in currency (taken from the market). Two other officers who received radio information of the robbery stopped a Rambler station wagon leaving the scene of the crime, and, after an investigation, arrested its occupants, defendant Wright and one Poulter. The details will be discussed later under the title "Alleged Illegal Search and Seizure."

A. *Appeal of Both Defendants.*

1. *Due Process.*

Under a separate heading "Due Process of Law" defendants refer to United States Constitution, Amendment XIV, California Constitution, article I, section 13; and *People* v. *Hamilton* (1963) 60 Cal.2d 105 [32 Cal.Rptr. 4, 383 P.2d 412] without designating in what way it is contended that defendants were deprived of due process. Perhaps they refer to all of the contentions thereafter raised by them. In any event, as will hereinafter appear, defendants were not deprived of due process.

2. *Lack of Separate Trials.*

Section 1098, Penal Code, provides, "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court orders separate trials. . . ."

Both defendants contend that the court erred in denying defendant Wright's motion for a separate trial. ■ The trial court has a broad discretion in determining whether to order joint or separate trials. (*People* v. *Lamb* (1962) 204 Cal.App.2d 255, 264 [22 Cal.Rptr. 284], hearing denied by Supreme Court.) Defendant Wright contends that the evidence supporting his connection with defendant Propp is indirect and that being joined with Propp in the trial created the appearance of their being associated. Propp, who did not take the stand, contends that he was entitled to a separate trial because his codefendant Wright testified.

■ The claims of both defendants that they were entitled to a separation of the trials is well answered in *Lamb, supra,* quoting from *People* v. *King* (1938) 30 Cal.App.2d 185, 206

[85 P.2d 928] : " 'It is not an abuse of discretion to refuse to grant a motion for a severance because damaging testimony or the admission or confessions of a codefendant might be admitted in evidence against such codefendant, and not be admissible against the moving defendant. [Citing cases.]' " (P. 264.)

The court in exercising its discretion to refuse separate trials is not depriving defendants of due process of law. (See *People* v. *Hidalgo* (1961) 195 Cal.App.2d 843, 846-847 [16 Cal.Rptr. 312].) The interests of justice did not require that in this case two separate trials be had, involving the same evidence arising out of identical facts and circumstances.

### 3. *Alleged Illegal Search and Seizure.*

Defendants contend that the search of the automobile in which Wright and Poulter were riding was illegal and that Wright's arrest was likewise illegal.[3]

The first question to be determined is whether the circumstances justified the officers in stopping the automobile and interrogating the men in it. If they did, then the matters discovered in that investigation justified the arrest of Wright and Poulter and the subsequent search of the automobile. As said in *People* v. *Mickelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658] : ". . . circumstances short of probable cause to make an arrest may still justify an officer's stopping pedestrians or motorists on the streets for questioning. If the circumstances warrant it, he may in self-protection request a suspect to alight from an automobile or to submit to a superficial search for concealed weapons. Should the investigation then reveal probable cause to make an arrest, the officer may arrest the suspect and conduct a reasonable incidental search. [Citations.]" (See also *People* v. *Cowman* (1963) 223 Cal.App.2d 109 [35 Cal.Rptr. 528].)

The circumstances justified the officers making the investigation they did. While on patrol several blocks away from the LoRay Market, Officers Farnsworth and Malone received a radio call informing them that a robbery was being committed by a man with a sawed-off shotgun. While

---

[3]Poulter was indicted with defendants Propp and Wright. He is not involved in this appeal. The record indicates that Poulter pleaded guilty to the charges. It is interesting to note that Poulter was charged with 12 prior convictions.

proceeding toward the scene of the crime they received a further radio report informing them that there were three suspects, one described as Filipino in appearance. As the officers drove into the parking lot, they observed an unidentified man who was pointing in the general direction of both Propp, who was running away from the market, and a green 1962 Rambler station wagon proceeding away from the market at slow speed.[4] The officers observed that one of the two occupants of the automobile appeared to be a Filipino (Poulter). The fact that Poulter was not a Filipino did not affect the right of the officers to assume that he might be the person described on the radio as one of the suspects.

The officers pulled in behind the Rambler and flashed a red light and spotlight. The Rambler did not stop immediately but drove through the next intersection and stopped in the middle of the street. The passenger in the car looked around at the patrol car. The Rambler then pulled away and proceeded further. After the siren was activated and the officers continued to flash the spotlight in the Rambler's rear window, the car stopped, having proceeded about one-half block further. The officers ordered the occupants of the car to get out so that they could be searched for weapons. It is clear that there was ample justification for stopping the car. (See *People* v. *Evans* (1959) 175 Cal.App.2d 274, 276 [345 P.2d 947].)

The circumstances up to this point, plus what was disclosed in the investigation prior to the arrest, amply justified the arrest and further search which followed. The officers observed that Poulter had a folded up paper sack under his shirt and was wearing two sets of clothing. Officer Farnsworth, while investigating the area of the right side of the automobile looked inside and observed a pistol on the floor-

---

[4]At the trial one Mercer, a janitorial employee, testified that at this time he was pointing in the general direction which Propp and the Rambler had taken. He meant to indicate only Propp and not the car. One of the officers had yelled out the window of their car, " 'The car?' " Mercer replied, " 'No, not the car.' " However the police car had already begun moving off. Mercer testified that as he spoke softly the police probably could not have heard him. At any rate, the officers thought he was pointing at the car which was the only moving object which the officers observed in the direction pointed out. The officers were justified in acting on the appearances insofar as investigating the persons in the moving car were concerned. In an emergency such as this—a car moving away from the scene of the robbery and a person apparently pointing to that car—prompt action by the officers was required and the fact that they made a mistake justified by the appearances did not overcome their right to make a reasonable investigation.

board next to the right front seat. Officer Malone then asked Poulter what he did with *his* gun. Poulter said " 'My toy gun is under the seat. All of the stuff is under the seat.' " The officer looked under the seat and found a toy gun. In the glove compartment of the car were some shotgun cartridges.[5] Justifying the arrest of Wright were the facts that the Rambler did not stop immediately when the patrol car flashed its light; that one of the occupants of the car resembled a Filipino; that although Wright bore no weapons, his companion was wearing two sets of clothing and was carrying a paper bag in his shirt; that a pistol was observed lying on the floor of the car. These circumstances provided probable cause for arresting both Wright and Poulter and searching the car. (See *People* v. *Lewis* (1960) 186 Cal.App.2d 585, 601-602 [9 Cal. Rptr. 263] ; *People* v. *Borbon* (1956) 146 Cal.App.2d 315, 319 [303 P.2d 560].)

4. *Order of Proof.*

Defendants do not discuss this contention in detail. They merely refer to a motion made at the beginning of the trial where they moved that the testimony of the "Witness Whittington" be heard before Officers Hamil and Farnsworth be permitted to testify. No witness by the name of Whittington testified at any time. ▮ It may be that defendants intended to refer to the witness Mercer, who, as hereinbefore stated, was seen by the officers to point in the direction of the moving Rambler. Apparently defendants contend that his testimony that he was pointing in the direction of the fleeing Propp and not the Rambler, and that the officers were mistaken in thinking that he was pointing at that car, would eliminate any probable cause for the officers' investigation of the men in the Rambler. Even though mistaken, the officers were entitled to act upon appearances, if the appearances would reasonably justify the belief that the witness was designating the Rambler. The appearances here did just that. ▮ "The order of proof is largely in the discretion of the trial court. [Citations.]" (*People* v. *Klimek* (1959) 172 Cal. App.2d 36, 44 [341 P.2d 722].) ▮ The court did not abuse its discretion in permitting the officers to testify prior to hearing Mercer's testimony.

5. *Cross-examination.*

▮ Defendants refer to seven instances in which the

[5]Later a sales slip from LoRay's Market dated that day was found.

court sustained objections to questions asked by defense counsel in cross-examination. All of the objections were properly sustained as the questions were either argumentative, speculative, or called for the opinions and conclusions of the witness. Defendants contend that by sustaining the objections the court prevented them from "ascertaining the arresting officers' true state of mind relative to facts surrounding the search and seizure." In every instance when the questions were properly put in this respect they were answered.

Reading the 669 pages of transcript of testimony as a whole it is evident that counsel were allowed a wide latitude of cross-examination. This was proper. (*People* v. *Watson* (1956) 46 Cal.2d 818, 827 [299 P.2d 243].)

### 6. *Best Evidence.*

Officer Farnsworth testified that the registration slip on the car in which Wright and Poulter were riding showed Propp's name and address. Defendants contend that their objection that this was not the best evidence was improperly overruled. The evidence fails to disclose who had possession of the car at the time of the trial. Assuming but not deciding[6] that the admission of this testimony was error, it was error without prejudice. Wright testified that the car was Propp's.

### 7. *Irrelevant Evidence.*

Defendants contend that Exhibits 13-B and 15 were irrelevant and should not have been admitted. Exhibit 13-B was a knotted stocking which Officer Farnsworth found in the Propp car close to where he found the toy gun on the floor beneath the front seat. Exhibit 15 consisted of a holster, tee-shirt and plastic sacks which the officer found in the car.

Defendants at the trial did not object to the admission of these exhibits. It is too late to do so now. (*People* v. *Jones* (1959) 52 Cal.2d 636, 646 [343 P.2d 577]; *People* v. *Feldkamp* (1958) 51 Cal.2d 237, 241 [331 P.2d 632].)

### 8. *Leading Questions.*

Although defendants contend that the court erred in permitting the prosecution to utilize leading questions on direct examination, they fail to cite a single instance in their briefs. An examination of the record discloses that in every instance

---

[6]Possibly a foundation should have been laid as to the present whereabouts of the car and the impracticability of obtaining the certificate of registration itself, if its production were impracticable.

where defendants objected to questions on this ground the objection was sustained. This contention must be disregarded.

9. *Emphasis on Robbery Charge.*

We find no emphasis in the 11 instructions to which defendants refer in their contention that the court unduly emphasized the robbery charge. Those instructions cover not only the robbery charges but also the conspiracy charges. Each instruction is a correct statement of the law and was necessary to clarify for the jury the legal tests the jury must use in evaluating the evidence. There was no unnecessary repetition and no prejudice to the defendants in these instructions.

10. *The Prior Convictions.*

 The jury returned to the courtroom from their deliberations and asked that certain portions of the testimony of Wright be read, including portions of the cross-examination. The cross-examination brought out the fact of Wright's prior felony convictions and his association in prison with Poulter. Defendants contend that permitting this portion of the cross-examination of Wright to be read to the jury unnecessarily emphasized these prior convictions. At the time of the jury's request that the cross-examination of Wright be read, the court stated that that cross-examination originally took about an hour, that it would have the cross-examination read until the jury indicated that it was satisfied. The reading then started. At no time did either defendant object to this procedure nor suggest that any portion of the cross-examination be eliminated. At the end of the reading the court asked "Is everybody satisfied with the reading now?" the jury foreman replied "Yes." Neither defendant expressed any dissatisfaction. Defendants having failed to object may not object now.

11. *Acts of the Prosecutor.*

Defendants contend that the prosecutor overly emphasized the prior convictions by charging in the information "prior offenses which have no bearing on the case and are not enumerated in the habitual criminal law." Defendants cite no authority to the effect that in charging prior convictions only those convictions enumerated in the habitual criminal law may be charged. There is no such restriction. On the contrary, section 969 Penal Code requires that "all known previous convictions, whether in this State or elsewhere, must

632

be charged." (See also § 969a.) Moreover, these charges were not read to the jury.

██ As hereinbefore shown the prosecutor on cross-examination of Wright brought out the fact of his prior convictions and referred to them in argument. This he was entitled to do for impeachment purposes. (Code Civ. Proc., § 2051.) ██ "It may be shown by the examination of a witness that he has been convicted of a felony, the number of felonies, and the names of them. [Citations.]" (*People* v. *Renteria* (1960) 181 Cal.App.2d 214, 218 [5 Cal.Rptr. 119, 78 A.L.R.2d 1275].) " 'This rule applies to a defendant who testified in his own behalf in a criminal trial despite the fact that such evidence may tend to prejudice him in the eyes of the jury.' [Citation.]" (*People* v. *Bagley* (1962) 208 Cal. App.2d 482, 488 [25 Cal.Rptr. 340].)

██ In argument the deputy district attorney stated, ". . . there were, from the facts you heard in this case, there were other crimes committed but the People have charged four counts." Defendants contend this statement was without support. The evidence showed that witness Bryan, assistant manager of LoRay's, whom defendant Propp forced at the point of the gun to open the safe, followed Propp out of the market. As Propp was running away Bryan hollered "Hey" at him. Propp "just discharged the gun he was carrying in the general direction—not actually towards me but he turned and fired the weapon." There was, therefore, another possible charge available. Under all the circumstances of the case the remark of the deputy district attorney could not have been prejudicial.

██ In argument the prosecutor stated that Wright had admitted that he was guilty of Count Four. (This charged the defendants as ex-convicts of having in their possession an automatic pistol and a sawed-off shotgun.) The prosecutor stated that he was referring to Wright's testimony that he had the gun found under the seat in the car and that on one occasion he was practicing with it. Defendant's counsel made an ambiguous objection, apparently to the effect that Wright was not charged with practicing with the gun. The court then admonished the jury to decide the case purely on the facts and to disregard counsel's argument unless it was based on the facts the jury heard from the witness stand. In view of the rule that a prosecutor " 'is permitted wide latitude in discussing the merits of the case and may state his views as to what the evidence shows as long as he stays within

reasonable limits' " (*People* v. *Luckman* (1961) 198 Cal.App. 2d 347, 353 [18 Cal.Rptr. 167]), and the admonishing of the court, there was no prejudicial action here.

Defendants cite three statements made by the district attorney in argument as attempts to play on the passions and prejudices of the jury. We have examined the instances referred to and find that they all were fair comment on the evidence. That defendants did not consider them otherwise at the trial is shown by the fact that defendants made no objection to them.

### 12. *Habitual Criminals.*

Section 644, Penal Code provides, "(a) Every person convicted in this State of the crime of robbery . . . who shall have been previously twice convicted upon charges separately brought and tried, and who shall have served separate terms therefor in any state prison and/or federal penal institution either in this State or elsewhere, of the crime of robbery, burglary, . . . grand theft, . . . escape from a state prison, . . . shall be adjudged a habitual criminal. . . ."

Propp was convicted in this case of the crime of robbery. Among the prior convictions he admitted were (1) conviction of burglary September 18, 1934, and (2) conviction of robbery July 27, 1942. He served terms in the state prison for each of those crimes.

Wright also was convicted here of robbery. Among the six prior convictions he admitted were (1) conviction of burglary on March 21, 1944, (2) conviction of grand theft May 14, 1947, and (3) conviction of escape from state prison on March 4, 1953. He served prison terms for all three although he contended that his sentence for escape had not been completely served. There is no merit in his contention that his conviction of escape could not be considered because of that fact. As stated in *People* v. *Dunlop* (1951) 102 Cal.App.2d 314, 317 [227 P.2d 281] ". . . it is not essential [to warrant conviction as an habitual criminal] that the defendant must have served the full term of his sentence under the prior conviction. [Citations.]" In *Spivey* v. *McGilvray* (1938) 29 Cal.App.2d 357, 360 [84 P.2d 256], one of the cases cited in *Dunlop, supra,* the court said, "Petitioner contends that before a prior conviction could be charged against him the sentence pronounced therein must have been fully served. In his case at the time of his last arrest he was still on parole. The section does not so require, and such a contention is

entirely foreign to the spirit and purpose of the act." It should be pointed out that Wright's sentences for burglary and grand theft (offenses included within § 644) had been completely served.

Defendants' main contention is that it was not alleged and proved that the terms for the prior convictions were *separately* served. That is, that in Propp's case the term for the robbery conviction was served separately from that for the burglary conviction, and that in Wright's case the term for the burglary conviction was served separately from the term for the grand theft conviction. The dates of the various convictions show that the charges were separately brought and tried, and that the terms of imprisonment for the offenses relied upon for the finding of habitual criminals necessarily must have been separately served. No contention is made on appeal that as a matter of fact the terms were not separately served.

Assuming that the indictment should have alleged that the prison terms mentioned therein were separately served (*People* v. *Dunlop, supra,* page 317 seems to so hold), defendants may not raise this objection for the first time on appeal. At no time in the proceedings below did defendants call the attention of the trial court to the lack of such allegation in the indictment. At the time of determination by the court that defendants were habitual criminals, defendant Wright objected to his conviction for escape being considered because he had not then finished serving the term therefor. Neither defendant raised any question concerning the sufficiency of the indictment.

In *People* v. *Smoot* (1950) 97 Cal.App.2d 306 [217 P.2d 732], the defendant contended that the information charging him with a prior conviction was "faulty and vitally so" (p. 307) because it merely charged him with violation of section 647a of the Penal Code, without stating which subdivision thereof. At that time there were two subdivisions. Subdivision 1 carried a penalty for a subsequent violation of it, while subdivision 2 did not. The court (a jury trial was waived) found the defendant guilty of violation of subdivision 1. On appeal the court pointed out that the defendant had not raised the question in the trial court, and that "No substantial right of the defendant was prejudiced by reason of the form of the information." (P. 308.)

Applicable here is the language in *People* v. *Guernsey* (1947) 80 Cal.App.2d 463, 466 [180 P.2d 27] concerning an objection on appeal to an information which was uncertain as

to the number of separate acts of rape which were charged. ". . . such objection was waived by defendants' failure to demur to the information or to raise the point during the trial." (P. 466.) (See also *People* v. *Barry* (1957) 153 Cal. App.2d 193, 203 [314 P.2d 531]; *People* v. *Ashcraft* (1956) 138 Cal.App.2d 820, 826 [292 P.2d 676]; *People* v. *Waid* (1954) 127 Cal.App.2d 614, 616 [274 P.2d 217]; *People* v. *Schoeller* (1950) 96 Cal.App.2d 61, 62 [214 P.2d 565].)

B. *Appeal of Defendant Wright.*

1. *Sufficiency of the Evidence.*

Wright not only contends that the evidence is insufficient to connect him with the robbery of the LoRay Market but that the prosecution's evidence clearly establishes his innocence. The evidence he refers to is the testimony of Officer Hamil who stated that at the police station after his arrest Propp when asked if he had any money on his person said, "No. Why do you think *I* was robbing?" (italics added) and to the testimony of Sergeant Rodden concerning a conversation in which Propp stated that "he had pulled the robbery alone." Defendant contends that the prosecution is bound by the statements of Propp. ▉ Defendant quotes from *People* v. *Mercer* (1962) 210 Cal.App.2d 153, 159 [26 Cal.Rptr. 502] where the court quoted from *People* v. *Collins* (1961) 189 Cal.App.2d 575, 591 [11 Cal.Rptr. 504], " 'The prosecution, having presented as a part of its case the statement of defendant as to how the killing occurred, is bound by that evidence in the absence of proof to the contrary.' " It will be observed that the quotation refers to a statement by the defendant, not to that of a codefendant, and also that the rule applies only "in the absence of proof to the contrary." The rule above expressed is qualified as stated in *People* v. *Lopez* (1962) 205 Cal.App.2d 807, 812 [23 Cal.Rptr. 532], "But the rule is thus qualified in its correct statement found in *People* v. *Acosta,* 45 Cal.2d 538, 542 [290 P.2d 1]: 'The courts may sometimes say that the prosecution is "bound by" extrajudicial statements of defendant which are introduced by the prosecution and which are irreconcilable with guilt, but this concept is applicable only where there is no other competent and substantial evidence which could establish guilt.' " (See also *People* v. *Scorza* (1959) 172 Cal. App.2d 571, 573 [342 P.2d 295].)

There was ample evidence to justify the finding of guilt. Wright in his testimony on the stand admitted having

Poulter as a close friend for 12 years and knowing Propp casually for five years. He also knew that neither had a job at the time. Wright and Poulter had committed crimes together. Wright, Poulter and Propp were in Folsom at the same time and knew each other there. The day of the robbery Propp and Poulter came to Wright's apartment in Merced with Mrs. Poulter and Propp's friend Hazel. The meeting was in celebration of the recent marriage of the Poulters. They decided to go to San Francisco and left Merced in two cars. The Poulters and Wright's friend Georgia went in Wright's car which Wright drove; Propp drove his own car, the Rambler, accompanied by Hazel. Wright testified that prior to this meeting there was general talk about robbery between Wright and Poulter, Wright telling Poulter that he had quit the "past life." Although they were intending to go to San Francisco for dinner, they spent the evening in Richmond at a bar. About a quarter to 10 the three men, leaving the women in the bar, got into Propp's car. Propp stopped the car in the parking lot of the LoRay Market. Somebody mentioned that they should get beer and Wright decided to buy a license holder for his car. All three went into the store. Wright purchased the holder. The receipt for this was found in the car. Wright testified that he asked the attendant about a restroom and she told him to go over on the grocery side of the store. Going over there he saw Poulter. He then noticed that Poulter was wearing khaki pants — a different set of clothing than when he was in the car. When he asked Poulter about it, Wright received a vague answer which made him suspicious. He then told Poulter he didn't want any part in whatever Poulter was going to do. Wright then started to look for the restroom and entered a door and started up the stairs in the warehouse.

Bryan, the assistant manager, saw Wright and Poulter talking together and saw Poulter leave the store and Wright enter the door leading to the warehouse. Bryan instructed two employees to see what Wright was doing. He was discovered part way up the stairs leading to a second level. He was told to go to the service station across the street when he asked for the restroom. One of the employees escorted Wright to the front of the store and let him out. Anderson, one of the store employees, returned to the warehouse. He heard a noise upstairs in the warehouse portion which Wright had just left. After taking a few steps he was

confronted by Propp carrying the sawed-off shotgun. Propp ordered him to lie on the floor and give him the combination of the safe. Anderson said that he did not know it but that Bryan did. Propp then ordered Anderson to proceed towards the cash register with his hands up. As he proceeded, Anderson felt an object prodding him in the back. (It was the sawed-off shotgun.) Bryan was standing by one of the cash registers. As Anderson approached, followed by Propp with the shotgun "in his back," Propp stated that if Bryan wanted Anderson to go to school the next day Bryan had better open the safe. Bryan did and under instructions of Propp put $4,000 to $5,000 in a paper bag. Propp ordered the employees to keep their hands up and then ran out the front door with the bag containing the money in one hand and the shotgun in the other.

 Thus the evidence so far showed that Wright, himself an ex-convict, came to Richmond with two friends whose criminal records he well knew; the peculiar circumstance of their delaying their dinner trip to San Francisco and then leaving the three women in the bar while the three men drove to the market, all three entering allegedly to purchase beer, but none of them going near the area where the beer was sold; the discussion between Poulter and Wright (Poulter at this time wearing two suits of clothes); Wright then went to the warehouse where Propp and his sawed-off shotgun were concealed; Wright and Poulter then left the store and got into Propp's car. (Was it to have a getaway car in readiness?) They left the parking area in the car without waiting for Propp. Wright claimed that they were driving around looking for Propp, but why leave the parking lot to which Propp ordinarily would be expected to return? When they heard the shotgun shot they started to leave the vicinity. When the patrol car following them turned its spotlight on the rear of their car, Wright turned and looked at the patrol car, and the Rambler then pulled away. When the car was stopped, there was found a gun lying on the floor in front of the portion of the seat Wright had just vacated.

It is clear that there was ample evidence to convict Wright without resort to his extrajudicial statements which will hereinafter be discussed.

2. *Other Instructions.*

People's Instruction No. 14 given by the court, states: "It is charged in Count One of the Information that at the

time of the commission of the offense therein described, the defendants, Fred Propp, Jr., and Roland Wayne Wright, were armed with a deadly weapon, to wit: a sawed-off shotgun.

██ "If you find the defendants, Fred Propp, Jr., and Roland Wayne Wright, guilty of the crime thus charged in Count One, it then will become your duty to determine whether or not they were armed with a deadly weapon at the time of the commission of the offense, as alleged in the Information, and you will include a finding on that question in your verdict, using a form that will be supplied for that purpose." Wright contends that joining him in this instruction was erroneous. It is difficult to understand his contention because he only refers to his argument on the subject of separate trials, which does not appear in point on this contention. Propp's possession of the sawed-off shotgun was established by several witnesses. Wright's guilt as a principal in the crime of robbery with a deadly weapon did not depend on his personal possession of the deadly weapon. There was no error in this instruction.

██ In giving Instruction 30 the court erroneously stated that specific intent was not an essential element of the offense charged in Count 2 (the conspiracy count) of the Information. Recognizing its error it corrected the instruction to refer to Count 3 (possession of sawed-off shotgun), and 4 (possession of sawed-off shotgun by ex-convicts). No harm resulted from this mistake particularly as the instruction fully covered the requirements to be found under the conspiracy charge.

C. *Application of Dorado.*

Subsequent to the trial and appeal of this case *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361] was decided. It is contended that the statements made by both defendants to the officers and introduced in evidence bring this case under the rule of *Dorado*, in that the evidence fails to disclose that before the statements were elicited neither defendant was informed of his right to counsel nor of his right to remain silent, and that any statement he might make could be used against him at a trial. The evidence does not disclose that either Propp or Wright were given the advice and warning required by *Dorado*.[7] Neither defendant

---

[7] There is no contention that except as affected by *Dorado*, there was any evidence that any of the statements made by either defendant were not freely and voluntarily made.

requested counsel, but our Supreme Court held at pages 347-348 that that fact would not prevent the application of the *Dorado* rule. That rule is that a *confession* may not be admitted in evidence if obtained with the following factors present: ''. . . (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights.'' (*People* v. *Dorado, supra,* 62 Cal.2d at pp. 353-354.)

1. *Defendant Wright's Statements.*

We will first review the situation as to statements made by Wright. The robbery took place around 10 p.m. Shortly after midnight Wright was interviewed at the police station by Sergeant Rodden. It was established that defendant entered freely and voluntarily into the discussion. His statements were made in response to questions by the Sergeant. His pertinent statements were that he knew both Poulter and Propp; that the afternoon of the Sunday of the robbery, Poulter, Mrs. Poulter, and another woman, came to his apartment in Merced; that at Poulter's request Wright went to the home of Raymond Jones, removed a pistol from underneath the front seat of Jones' automobile; that Poulter, Mrs. Poulter, Wright and his girlfriend came to Richmond in Wright's Falcon where they ended up in a bar with Propp and his girlfriend; that the three men then left in Propp's car and went to the market. All three entered the store; Wright left, however, before anything occurred.

The next day, in the presence of Sergeant Rodden, and a shorthand reporter, Wright was questioned by Inspector Davis and Sergeant Rodden, and a recording of the interview was made. This recording was played to the jury and the reporter's transcript of it admitted in evidence. In addition to the matters mentioned in the statements as to which Sergeant Rodden testified, are the following: Propp had said that he wanted to buy ''some stuff'' and so he went into the store. After Wright got in the store, he saw what Propp had in mind, namely, that Propp was going to rob it, so Wright got out as he wanted no part in any robbery. Wright did not know whether or not Propp was armed. When they

entered the store Wright did not realize what Propp's intentions were. Wright had known Poulter for 12 years or better; Propp for about five years. Both in Fresno and Merced Wright was present at discussions with both in which they talked about coming to Richmond to pull a robbery or burglary. They wanted Wright to join with them; they tried to talk him into it. He first saw Jones' gun in Merced when he and Jones were using it for target practice on the golf course. When Propp and Poulter asked him to get them a gun he remembered that Jones kept it under the front seat of his car. So on Sunday, defendant went to the car, got the gun and put it under the front seat on the right side of Propp's car. Wright was riding in that seat when stopped by the police and the gun was concealed under the seat. Wright had seen the toy pistol which was also found in Propp's car once before when Poulter showed it to him in Fresno. They discussed that it looked real. He knew that the other two were "coming up to the Bay Area for some purpose." He had never seen the sawed-off shotgun before, although he had heard Propp talk about it existing. In the store he did not notice any cloth tied around Propp's neck. Wright did not have in his possession a woman's stocking with a knot tied in one end; nor did he see it in the car.

Assuming that Wright's statements were not admissible as being in violation of *Dorado*, it becomes necessary to determine whether they were "confessions" or merely "admissions." ▮▮▮ "A confession is a voluntary statement that was made by one who is a defendant in a criminal trial, at a time when he was not testifying in that trial, by which he acknowledged certain conduct of his own that constituted a crime for which he is on trial, a statement which, if true, discloses his guilt of that crime and excludes the possibility of a reasonable inference to the contrary. [Citations.] ▮▮▮ As said in *Ferdinand,* a confession 'leaves nothing to be determined, in that it is a declaration of his [defendant's] intentional participation in a criminal act . . .' [Citation.]" (*People* v. *Swayze* (1963) 220 Cal.App.2d 476, 492 [34 Cal. Rptr. 5].) ▮▮▮ A confession " 'is not equivalent to statements, declarations, or admissions of facts criminating in their nature or tending to prove guilt. It is limited in its meaning to the criminal act, and is an acknowledgment or admission of participation in it.' " (*People* v. *Ferdinand* (1924) 194 Cal. 555, 569 [229 P. 341].) ▮▮▮ "An admission as applied to criminal law is something less than a

confession, and is but an acknowledgment of some fact or circumstance which in itself is insufficient to authorize a conviction, and which tends only toward the proof of the ultimate fact of guilt.'' (P. 568.) When the statement is such that it contains only facts from which guilt may be inferred, it is admission rather than a confession. (*People* v. *Elder* (1921) 55 Cal.App. 644, 647 [204 P. 29]; *People* v. *Luzovich* (1932) 127 Cal.App. 465, 469 [16 P.2d 144].)

In *People* v. *Wilkins* (1910) 158 Cal. 530, 534 [111 P. 612], it was held that the admission by the defendant that he buried the body of the murdered woman was not a confession that he committed the murder, even though it might be a confession of the crime of secret burying of a human body.

 While there were a number of incriminating elements in Wright's statements they do not amount to a confession of the robbery. The statements were intended to be exculpatory. Wright admitted being with defendant Propp who actually committed the robbery, denied knowing that Propp entered the market to rob it, yet admitted that Propp and Poulter had asked him to join them in a robbery. He had obtained a pistol for them. (There is no evidence that this pistol was ever carried into the market by any of the participants.) As to the robbery and conspiracy charges — he was denying that he had any part in it, so none of his statements were, or are tantamount to, a confession.

Wright was convicted of Count 1 (robbery); Count 2 (conspiracy); and Count 4. This last count charged Poulter and Propp and Wright with being felons in possession of ''automatic pistol'' (the one found on the floor in the car where Wright was sitting) and a sawed-off shotgun. The jury's verdict on this count read ''We, the Jury in this case, find the defendant, Roland Wayne Wright, Guilty of the offense charged in Count Four of the Information (Possession of Concealed Weapon*s*).'' (Italics added.) Under this charge a finding of possession of either of these weapons would support the conviction. It did not require possession of both, although the jury found Wright guilty of possession of both.

 Although there was no evidence of physical possession of the shotgun by Wright, the finding by the jury of his participation in the robbery with Propp, who used the shotgun in it, supports Wright's conviction of possession of the shotgun. Wright's statements to the police concerning his obtaining the pistol in Merced, putting it in Propp's car,

and sitting on the seat under which the pistol was found, might very well be the type of confession prohibited by *Dorado,* and were Wright convicted only of possession of that pistol the conviction might have to be set aside. However, his conviction of possession applied equally to the shotgun in the hands of Propp as to this gun. Wright at no time made any confession or even statements relative to possession of the sawed-off shotgun. He at all times denied seeing or knowing anything about that gun. As far as his conviction of possession of concealed weapons is concerned, Wright's statements were merely admissions.

▉ *Dorado* contemplates that the introduction in evidence of statements which are not confessions but merely admissions, as are the statements here, and which come under the *Dorado* rule, may not necessarily be prejudicial error. "[U]nder some circumstances the introduction into evidence of statements obtained from a defendant during police interrogation in violation of his right to counsel and his right to remain silent may constitute harmless error" if the statements are not confessions. (*People* v. *Dorado, supra,* 62 Cal.2d 338, 356.) See also *People* v. *Hillery* (1965) 62 Cal.2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382], holding that where statements which are not confessions are erroneously admitted the question of prejudice may be considered. Thus section 4½ of article VI, California Constitution may be applied.

In *People* v. *Finn* (1965) 232 Cal.App.2d 422, 428 [42 Cal.Rptr. 704], the court held that it is a question of fact to be determined in each case by the reviewing court whether or not the admission of a statement not amounting to a confession, which violates *Dorado,* prejudices the defendant and deprives him of a fair trial.

In the following cases the admission of statements violating the *Dorado* rule were held not to be prejudicial under the circumstances of the particular case: *People* v. *Galloway* (1965) 233 Cal.App.2d 369, 374 [43 Cal.Rptr. 617] (where the defendant was asked after arrest concerning his possession of the stolen property); *People* v. *Nelson* (1965) 233 Cal. App.2d 440, 445 [43 Cal.Rptr. 626] (where the defendant's statements at three different police interrogations were admitted); *People* v. *Ghimenti* (1965) 232 Cal.App.2d 76, 84 [42 Cal.Rptr. 504] (where the defendant after arrest was asked as to ownership of the clothes in which the contraband was found and he gave "a spontaneous reply to an

impulsive remark"); *People* v. *Beverly* (1965) 233 Cal.App. 2d 702, 717 [43 Cal.Rptr. 743] (where the defendant made several statements after arrest including replies in an investigation recorded on tape); *People* v. *Herrera* (1965) 232 Cal. App.2d 558, 560 [43 Cal.Rptr. 12] (where defendant was convicted of sale of heroin and admitted using heroin).

Wright's statements, with the possible exception of his statement that he obtained the gun found on the floor of the car, added very little to the evidence the officers already had. Wright was identified by the clerk as having been in the market; the sales slip showing his purchase there that night was found on his person, and he was present in the automobile with Poulter who wore two pairs of trousers and had a folded paper bag in his waistband.

*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], gives the test for applying section 4½ "That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'' Applying this test to the record before us we are of the opinion that it is not reasonably probable that a result more favorable to Wright would have been reached in the absence of the admission of Wright's statements.

2. *Defendant Propp's Statements.*

Apparently defendant Propp's first statement to any officer occurred at the police station where he was being booked. The jailer asked him if he had any money on his person and he replied, "No, I have no money. *Why do you think I was robbing?*" (Italics added.) Obviously *Dorado* could not apply to this statement. The question asked was a proper one, as it is the duty of a jailer to take for safekeeping any money an arrested person may have. The incriminating answer was not sought nor called for by the question, and was a completely voluntary admission of guilt.

The next thing that occurred, Sergeant Rodden and Inspector Davis went to Propp's cell at the jail early Monday morning. Propp was asleep and they woke him up. He was indignant and told them that if they wanted any information to check with the booking officer, that he had told him all about the robbery, "how he had done it and everything."

Later that day, Sergeant Rodden and Inspector

Davis again interviewed Propp, who then stated that he came to Richmond by himself, walked alone to the market and "pulled the robbery alone." He first stated that he had the shotgun mailed to him at Richmond, and then said he must have sent it by Greyhound; that he purchased it from a "spook" on the streets of Fresno. Propp refused to give a recorded statement.

 Obviously, all three of Propp's statements are confessions. The first two being unsolicited and spontaneous would not come within the Dorado rule. (*People* v. *Dorado*, *supra*, 62 Cal.2d 338, 354.) The third, however, would come within the exclusionary rule if it was the result of a process of interrogations that was intended to elicit incriminating statements, were it not for the peculiar circumstances of this case which afford, we conclude, clear evidence that the fourth factor set forth in *People* v. *Dorado*, *supra*, at pages, 353-354, was not present.

The Supreme Court has indicated that when there is clear evidence of waiver of either the right to counsel or the right to remain silent, the exclusionary rule does not apply to statements made thereafter. The court states in *Dorado*, *supra*, at page 352: "*Escobedo* also holds that the accused has the right not to incriminate himself and to remain silent, and that, if any self-incriminating statements are to be admissible, he must waive that right. . . ." Again, at page 353: "[T]he prosecution could not introduce into evidence defendant's confession *unless that right of silence were waived;* . . ." (Italics added.) And at pages 353-354: "(4) [T]he authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, *and no evidence establishes that he had waived these rights.*" (Italics added.) In *People* v. *Modesto* (1965) 62 Cal.2d 436 at page 447 [42 Cal.Rptr. 417, 398 P.2d 753], the court states: "[T]hese statements are inadmissible unless as to them defendant waived his right to counsel and his right to remain silent. In view of his reference to his attorney's advice with respect to making these statements, it is possible that defendant waived his rights as to them."

Any confession of guilt has naturally an explosive effect upon a defendant's case and upon the presumption of innocence. If a defendant has not yet caused such an explosion *before* the critical stage at which his right to counsel matures (*People* v. *Dorado, supra,* pp. 338, 349, 357; *People* v. *Stewart* (1965) 62 Cal.2d 571, 577-579 [43 Cal.Rptr. 201, 400 P.2d

97]; *People* v. *Schader* (1965) 62 Cal.2d 716, 726 [44 Cal. Rptr. 193, 401 P.2d 665]; *People* v. *Forbs* (1965) 62 Cal.2d 847, 851 [44 Cal.Rptr. 753, 402 P.2d 825], then if he is informed of and avails himself of his right to counsel, he can freely choose whether to cause the explosion himself or to refrain from doing so. But when he has already caused the explosion *before* the critical accusatory stage, as Propp did in the instant case, neither the assistance of counsel nor his silence could undo the harm already done. By confessing to the robbery under circumstances in which none of his constitutional rights were violated, he clearly lost his right to remain silent as to that same confession.[8] This is not a case in which the record is silent or ambiguous as to whether there was a waiver of Propp's rights. (See *People* v. *Modesto, supra,* 62 Cal.2d 436, 447; *People* v. *Stewart, supra,* 62 Cal. 2d 571, 581; *People* v. *Lilliock* (1965) 62 Cal.2d 618, 621-622 [43 Cal.Rptr. 699, 401 P.2d 4]; *People* v. *Schader, supra,* 62 Cal.2d 716, 727.) The spontaneous and unsolicited confessions by Propp are clear and convincing evidence of an intelligent waiver of his right to remain silent and of his right to counsel as to the crime to which he had already confessed.

Propp himself has caused his own greatest harm. The situation here is somewhat similar to the hypothetical situation described in *Dorado, supra,* at footnote 8, page 354, where a person not known as a suspect wants to confess a crime. Although in our case Propp was a suspect (actually he was in custody after arrest), he clearly wanted to confess. Nothing he said in his third statement added particularly to his incrimination by his first two statements, nor indicated in any way that his desire to talk, as evidenced by those two statements, had changed. With defendant's obvious guilt, as evidenced by the explosion of any presumption of his innocence and his obvious desire to talk, it would be well nigh criminal to hold that the *Dorado* exclusionary rule applies to his third confession.

D. *Comment and Instruction on Failure to Testify.*

Propp did not take the stand. The assistant district

[8]Nothing we say is intended to imply that *in the absence* of a waiver of a defendant's right to counsel and to remain silent, his incriminating statements are admissible after he has been informed of only one of the two constitutional rights intended to be protected by *Dorado* and its predecessor, *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977].

attorney commented on this and the court gave the customary instruction on failure to testify. (CALJIC No. 51, Revised.) In the recent case of *Griffin* v. *California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106] the trial court gave an instruction on the failure of the defendant to testify similar to that given in the case at bench. The United States Supreme Court held "that the Fifth Amendment [to the United States Constitution], in its direct application to the Federal Government and its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (P. 615.)

In *People* v. *Bostick* (1965) 62 Cal.2d 820 [44 Cal.Rptr. 649, 402 P.2d 529], the California Supreme Court applied *Griffin, supra,* to the fact that the prosecutor commented on the failure of the defendants to testify and the court instructed the jury regarding the legal effect of that failure to testify, the instruction being similar to that condemned in *Griffin* and given in the case at bench. Our Supreme Court, after referring to the fact that the United States Supreme Court in *Griffin, supra,* "recently held that our comment rule violated the Fifth Amendment privilege against self-incrimination" stated: "It follows, therefore, that the comment of the prosecutor and the trial court's instruction herein each constituted error. That portion of section 13 of article I of the California Constitution which purports to authorize such comment must bow to the superior mandates of the Fifth and Fourteenth Amendments to the United States Constitution.

"Such error, unless it resulted in a miscarriage of justice, does not, however, automatically require a reversal if article VI, section 4½, of our Constitution is applicable to it. We are of the opinion that such section is applicable." (P. 823.) The court then discusses at considerable length both federal and California decisions which appear to have held that whenever error is predicated upon constitutional grounds, the judgment is reversible *per se,* and distinguishes them, pointing out that in both federal and California decisions, erroneous denials of constitutional guarantees "have consistently been held not to require reversal when not prejudicial." (P. 826.) The court then determined "that the rule of article VI, section 4½, of the California Constitution is applicable to this situation [comment by prosecutor and instruction by the court on the defendant's failure to testify], . . ." (P. 824.) The court then went on to say that "we would ordinarily pass

on the factual question whether the comments did or did not cause a miscarriage of justice. But we need not do so here because the judgments must be reversed for other reasons. . . ." (P. 827.) In the case at bench, for the reasons hereinbefore set forth as to the clear guilt of Propp, we conclude that the errors in commenting and instructing on Propp's failure to testify were nonprejudicial as "there is no reasonable probability that the jury would have reached a result more favorable to defendant." (*People* v. *Hillery, supra,* 62 Cal.2d 692, 713), if such errors had not occurred.

Judgments affirmed.

Sullivan, P. J., and Molinari, J., concurred.

A petition for a rehearing was denied July 28, 1965, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied September 2, 1965.