[Crim. No. 176.   Fifth Dist.   Feb. 1, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. CLIFFORD TOMLIN COLLIER, Defendant and Appellant.

D. Dwayne Keyes and Chris E. Rockas, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edward A. Hinz, Jr., and Roland K. Hall, Deputy Attorneys General, for Plaintiff and Respondent.

BROWN (R. M.), J.—The appellant was charged with two counts, the first count for violation of Penal Code section 217 in that he did wilfully, unlawfully and feloniously make an assault with a deadly weapon (a pistol) on Thelma Nickerson with intent to murder her; and the second count for violation of Penal Code section 12021 in that he had in his possession a pistol and had theretofore been convicted of a felony, the crime of escape. The matter was tried before a jury and he was found guilty on both counts and sent to state prison.

The appellant on the afternoon of September 26, 1963, had told a Maggie Jones that he was going to shoot Thelma Nickerson—not to kill her, but to fix her so that no one else would want her. That evening Thelma Nickerson, Virgie Mae Smith and Addie Mae Timmons walked out of the front door of the house of one of the women in Bakersfield. The Nickerson car was parked in front of the house; appellant's car was parked down the same street. As she approached her car the appellant walked up to her and after a short conversation, and without further warning, the appellant is alleged to have shot her twice in the interior median aspect of her right upper leg. The appellant then ran to his automobile and left the scene. At about 1:30 a.m. of the following morning the appellant came to the police station with his brother and sister-in-law where he was taken to the patrol squad room by Sergeant Dodd, where the shooting in question was discussed. After questioning as to what happened, the appellant stated that he had become angry at Thelma Nickerson and felt he had to hurt her, that he did not intend to kill her and that he had thrown the gun he used out of his car as he drove off. In the next hour or so appellant went with a Sergeant Fidler and Detective Wheeler to look for the gun.

During the trial it was the appellant's defense that he did not have a gun, that he did not shoot Thelma Nickerson, that he heard two shots fired, that he did not know where the shots came from, and that he did not tell Maggie Jones that he was going to shoot Thelma. However, other testimony at the trial as to the occurrence during the short period of time varied from witness to witness. Addie Mae Timmons said she saw the appellant pull a gun out of his pocket and shoot the victim, while Virgie Mae Smith said she saw a flash when the sound of shots was heard but did not see a gun. On cross-examination she stated that she did not see a flash; that he pulled something out of his pocket which looked like a gun.

The victim, who was within touching distance of the appel-

lant, stated that she did not see a gun and did not know who shot her. This statement was made to the doctor who treated her as well as on direct examination at the trial. It was her contention that another friend of hers who was parked across the street at the time could have shot her.

It is appellant's contention that the confession was inadmissible, having been obtained in violation of due process of law. In this case the appellant was notified by his brother that the police were looking for him and his life might be in danger if he were armed at the time of arrest. Thus, in the company of his brother and sister-in-law the appellant went to the police station and voluntarily surrendered himself. At this time the appellant had been named by a witness as a suspect in the case. The officers were not looking for any other person as a suspect. When the appellant arrived at the station Sergeant Dodd took him into a private room for questioning and the appellant contends that the investigation was no longer one of general inquiry but had shifted to the stage of accusation, that the focus was on the accused, and that he was taken into the interrogating room for the purpose of eliciting from him a confession, which was done without Sergeant Dodd's advising the appellant of his rights to an attorney or to remain silent.

This case was tried before the *Dorado* decision, and not being final, is subject to the application of *In re Lopez,* 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380]. In *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], the requirements necessary to support appellant's contentions are given, as follows: ''We conclude, then, that defendant's confession could not properly be introduced into evidence because (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights.'' (Pp. 353-354.)

Respondent concedes that the first two requirements and the fourth requirement are met, but submits that the third requirement has not been met because the authorities had not

carried out a process of interrogation that lent itself to eliciting incriminating statements.

In the recent case of *People* v. *Stockman,* 63 Cal.2d 494, the Supreme Court said at pages 497-498 [47 Cal.Rptr. 365, 407 P.2d 277] : "In determining whether the police carried out a 'process of interrogations,' we must 'analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances.' "

Respondent further relies on *People* v. *Cotter,* 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862]. There, the deputy sheriffs were at the scene of the crime when they received information that the defendant had called the sheriff's station indicating where he could be found, gave the desk officer his name, told him he had just tried to kill a woman, and that he could be found at a certain corner. The Supreme Court held that his statements were "clearly admissible as having been made in the investigatory stage."

In *People* v. *Chaney,* 62 Cal.2d 767, at pages 769-770 [48 Cal.Rptr. 188, 408 P.2d 964], the court discusses the question raised by the defendant as to whether the authorities were carrying on a process of interrogation which lent itself to eliciting incriminating statements. The People argued that because the defendant voluntarily appeared at the sheriff's office and indicated his desire to "clear the matter up," the confessions taken from him were spontaneous and unsolicited. The court held at page 771: "In view of the foregoing 'total situation,' and particularly the place setting of the interview and prior knowledge of the inspector [citation], little doubt is left that defendant confessed during a process of interrogation designed to elicit incriminating statements. While the record is meager as to the manner in which the interview was carried on, it does appear that defendant was interrogated rather than merely given an opportunity to make any statement he wished."

We hold that the interrogations set forth in the case before us are comparable to those set forth in *People* v. *Chaney, supra,* in that after examining all of the circumstances, this was a process of interrogation since the officers knew who the suspect was, they had him in custody, and were in a definite way finding out from him what he had done in connection with the shooting of Thelma Nickerson. (See *People* v. *Bilderbach,* 62 Cal.2d 757 [44 Cal.Rptr. 313, 401 P.2d 921].)

With reference to count 2, and pursuant to the facts and the law stated hereinabove, it is also necessary to hold that the *Dorado* rule was violated.

The judgment is reversed.

Stone, J., concurred.

CONLEY, P. J.—I dissent. The only question on appeal is whether the *Escobedo*[1] and *Dorado*[2] rule makes the admission in evidence of the confession of the defendant reversible error. The guilt of the defendant was amply and conclusively proved by numerous witnesses entirely aside from his confession. He shot the victim, a married woman, in the upper thigh, after declaring that he would fix her so that no other man would want her. His confession was complete, damning, and voluntary; it was not made in the process of accusation or interrogation but was a wholly voluntary act within the meaning of the authorities. He went to police headquarters on his own legs, when his brother told him that the law enforcement authorities wanted to see him.

The police had begun to make a preliminary investigation of the shooting within a short time before his appearance at headquarters and they were continuing this investigation at the time the defendant appeared there. The police did not at that time press inquiries or cross-examine him, but permitted the defendant, in his own way, to state what he knew about the crime. He was not then under arrest and he was not handcuffed or mistreated in any way. At that time, he voluntarily admitted that he shot the victim with a pistol, which, as a previously convicted felon, he was not authorized to have.

The evidence of his confession was properly received under the general principles reiterated and firmly established recently by the Supreme Court in the opinion in *People* v. *Cotter*, 63 Cal.2d 386, 393-398 [46 Cal.Rptr. 622, 405 P.2d 862], where it is said: "The more crucial conversation (the fourth) with the officers in the police car, was admissible for the further reason of absence of one of the conditions deemed essential to render the statement inadmissible under the rules laid down in *Escobedo, Dorado* and *Stewart*. Clearly, the statement made in the police car was not the product of a

[1]*Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977].

[2]*People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

process of interrogation aimed at eliciting incriminating statements from defendant. The police merely asked him what had happened at the Buus residence. They were affording him an opportunity which police officers normally and routinely offer to any person whom they are taking into custody to give any explanation of his conduct which he may desire to give. It is a routine means of commencing an investigation.

"As heretofore indicated, defendant in his testimony at the penalty phase confirmed that in the police car the officers only asked him to tell them what had happened. Obviously, therefore, none of the statements down to and including that in the police car may be classified as anything other than voluntary confessions and admissions of defendant, in no way rendered inadmissible under the requirements of *Escobedo, Dorado* or *Stewart*. Those cases deal with the inadmissibility of statements made by an accused during the accusatory stage, which statements are inadmissible in evidence unless the accused was duly forewarned of his right to counsel and to remain silent. They were aimed at restraining law enforcement officers, once the accusatory stage has been reached, from the use of inquisitorial techniques in seeking to prove the charge against the accused out of his own mouth. They were never intended to discourage a defendant from volunteering to the police his complicity in the perpetration of a crime nor to prohibit the police from receiving and acting upon such confessions. Certainly, here, there were no inquisitorial techniques or processes of interrogation, designed to elicit incriminating statements, engaged in by the arresting officers when they were in the police car.

"The purpose of the *Escobedo-Dorado* rules has been defined as 'primarily to prevent police tactics which, in the past, have spawned involuntary confessions.' (*In re Lopez,* 62 Cal.2d 368, 372-373 [42 Cal.Rptr. 188, 398 P.2d 380].) To determine what tactics the courts were referring to we turn briefly to the facts in the particular cases. In *Escobedo* the defendant had been arrested and was in custody in the police station when the interrogation took place. One of the arresting officers told defendant that another person, naming him, had told the police that the defendant was the person who had shot the deceased. The defendant testified, without contradiction, 'that the "detectives said they had us pretty well, up pretty tight, and we might as well admit to this crime," and that he replied, "I am sorry but I would like to have

advice from my lawyer.'' ' During the course of the interrogation defendant repeatedly asked to speak to his lawyer and the police said that his lawyer 'didn't want to see' him. Testimony of the police officers confirmed these accounts in substantial detail. 'At one point, as previously noted, [defendant] and his attorney came into each other's view for a few moments but the attorney was quickly ushered away. [Defendant] testified ''that he heard a detective telling the attorney that the latter would not be allowed to talk to [him] 'until they were done' '' and that he heard the attorney being refused permission to remain in the adjoining room. A police officer testified that he had told the lawyer that he could not see [defendant] until ''we were through interrogating'' him.' The defendant was handcuffed in a standing position, he was nervous, he had circles under his eyes and he was upset and agitated because he had not slept well in over a week. It was also undisputed that during the course of the interrogation a Spanish-speaking officer who knew defendant's family conferred alone with defendant for about a quarter of an hour in Spanish, promising defendant that he could go home if he ' ''pinned it on Benedict DiGerlando,'' that ''he would see to it that we would go home and be held only as witnesses, if anything, if we had made a statement against DiGerlando . . . , that we would be able to go home that night.'' ' Defendant testified that because of this assurance he made the statement which was held improperly received in evidence. The officer denied offering such assurance. (*Escobedo* v. *Illinois, supra,* 378 U.S. 478, 482.) It is clear that the Supreme Court of the United States was confronted in *Escobedo* with the admissibility of a statement which, while it fell short of being a coerced or involuntary confession, was the product of 'police tactics which, in the past, have spawned involuntary confessions.' (*In re Lopez, supra,* 62 Cal.2d 368, 372-373.)

''Similarly, in *Dorado* (62 Cal.2d 338) the questioned statements were the product of accusatory, inquisitorial tactics. Defendant was an inmate of a state prison, correctional officers had discovered some very incriminating evidence indicating that he had murdered a fellow inmate, and a series of separate interrogations was entered upon, over a period of several days. They were held in the presence of a prison official and a deputy district attorney. During the first day the defendant gave a written statement. Two days later, when the third interrogation took place, defendant impli-

cated a codefendant. At his trial defendant claimed that his statements had not been freely and voluntarily given, partly because he feared threats made by a prison official at the initial interrogation. The officers denied any coercion and the trial court admitted the defendant's statements as voluntary. Parenthetically, that court did find that the confession of a codefendant inmate was the result of coercion.

"In *People* v. *Stewart*, 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97], this court stressed that it is when 'the officers have undertaken a process of interrogations that lends itself to eliciting incriminating statements, [that] the accusatory or critical stage has been reached and the suspect is entitled to counsel,' and took pains to distinguish the case of *United States* v. *Konigsberg*, 336 F.2d 844, 853. In the latter case as *Stewart* relates, 'Federal Bureau of Investigation agents apprehended the defendants in a garage containing stolen goods, arrested them and took them to the bureau's office. At that office, prior to an arraignment, the agents asked Konigsberg " 'why he was in this garage and just what had taken place . . . and . . . if he wished to cleanse himself or explain . . . what his reasons for being there were, why the other individuals were there.' " ' *Stewart* also points out (p. 579): 'Among other reasons for not applying *Escobedo*, the court [in *Konigsberg*] said that the purpose of the interrogation, even though it took place after the arrest, was not to elicit a confession. The court stated, "The uncontradicted purpose of the discussion was to give Konigsberg a chance to explain his presence in the garage if he could; to hear Konigsberg's side of the story. . . . If Konigsberg or any of the other people caught in the garage could account for their presence this was their opportunity." ' In *Stewart* the court further noted: 'Whatever may be the subjective intent of the interrogators, we must, in order to determine if the police are carrying out "a process of interrogations that lends itself to eliciting incriminating statements" (*Escobedo* v. *Illinois, supra,* at p. 491), analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances.' (*People* v. *Stewart, supra,* 62 Cal.2d at p. 579.)

"In *Stewart* the defendant had been in custody for five days and had been interrogated daily. When this court declared that the nature of the questions asked can be helpful in applying the *Escobedo* test, it is to be noted that it was

reviewing an interrogation which started with an accusation, 'Roy, you killed that old woman . . . ,' and that the court pointed out that the extensive interrogations could serve no other purpose than to elicit incriminating statements.

"It is noteworthy that in *Escobedo, Dorado* and *Stewart* the defendants were denying complicity and the police were openly accusing them and urging them to tell the truth. By contrast, here the defendant was merely asked to state what had happened. He was not being accused of a crime which he had previously denied committing, which was the case in *Escobedo, Dorado* and *Stewart,* but in fact was asked concerning a crime which he had already freely admitted having committed.

"Neither this court, nor the United States Supreme Court, has ever taken the position that the desire of a guilty man to confess his crime should be stifled, impeded, discouraged, or hindered in any way. The contrary is true.

"In a concurring opinion in *People* v. *Garner* (1961) 57 Cal.2d 135, 162-164 [18 Cal.Rptr. 40, 367 P.2d 680], then Associate Justice, now Chief Justice, Traynor stated:

" 'The perpetrator of a crime is normally the one who knows most about it, and his confession, voluntarily made, is often the best evidence of his guilt that can be obtained. (See *Commonwealth* v. *Dillon,* 4 Dall. (U.S.) 116, 117 [1 L.Ed. 765]; *Commonwealth* v. *Agoston,* 364 Pa. 464 [72 A.2d 575, 583]; *People* v. *Valletutti,* 297 N.Y. 226 [78 N.E.2d 485, 488]; *Haley* v. *Ohio,* 332 U.S. 596, 614 [68 S.Ct. 302, 92 L.Ed. 224] [dissenting opinion].) Only overwhelming social policies can justify the exclusion of such vital evidence. In the case of coerced confessions, the evidence may be unreliable; even if reliable, a free society cannot condone police methods that outrage the rights and dignity of a person whether they include physical brutality or psychological coercion. (See *Spano* v. *New York,* 360 U.S. 315, 320-321 [79 S.Ct. 1202, 3 L.Ed.2d 1265]; Maguire, Evidence of Guilt, § 109.) When a confession is voluntary, however, courts are reluctant to exclude it. "Interrogation *per se* is not, while violence *per se* is, an outlaw." (*Ashcraft* v. *Tennessee,* 322 U.S. 143, 160 [64 S.Ct. 921, 88 L.Ed. 1192] [dissenting opinion]; see *Lyons* v. *Oklahoma,* 322 U.S. 596, 601 [64 S.Ct. 1208, 88 L.Ed. 1481]; *Lisenba* v. *California,* 314 U.S. 219, 239-241 [62 S.Ct. 280, 86 L.Ed. 166].)

" 'As many commentators and courts have recognized, there is a "compulsion to confess" to crime. Wigmore states

the point colorfully: ''The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; and when detection comes, the pressure is relieved; and the deep sense of relief makes confession a satisfaction. At that moment, he will tell all, and tell it truly. To forbid soliciting him, to seek to prevent this relief, is to fly in the face of human nature.'' (Wigmore on Evidence (3d ed.) § 851 at p. 319; see, e.g., *Commonwealth* v. *Agoston*, 364 Pa. 464 [72 A.2d 575, 581, 583].) A psychiatrist explains the phenomenon of confessions in terms of subconscious but overpowering guilt feelings and desire for punishment. ''There is . . . an impulse growing more and more intense suddenly to cry out his secret in the street before all people, or in milder cases, to confide it at least to one person, to free himself from the terrible burden. The work of confession is thus that emotional process in which the social and psychological significance of the crime becomes preconscious and in which all powers that resist the compulsion to confess are conquered.'' (Reik, The Compulsion to Confess, p. 267.)

'' 'So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation.'

''Chief Justice Traynor's statement was subsequently adopted by the unanimous opinion of this court in *People* v. *Ditson*, 57 Cal.2d 415, 434-435 [20 Cal.Rptr. 165, 369 P.2d 714].

''*Escobedo, Dorado* and *Stewart* are also to be distinguished from the case at bench in that in none of them was the court confronted with the problem here presented of determining the legal effect of receiving in evidence a series of confessions and statements, some of which were made during the investigatory phase and were properly received and others of which were given during the accusatory stage and were improperly considered.

''Such a problem was before the court in the recent case of *People* v. *Jacobson, ante,* p. 319 [46 Cal.Rptr. 515, 405 P.2d 555]. There, the improperly obtained statements were held to be merely cumulative, and since they occurred last in sequence it was held that they could not give rise to an implication that the legally obtained confessions were 'induced' by any subsequently improperly obtained. (*People* v. *Jacobson, supra,* at pp. 330-331.) Under such circumstances this court held that there is no reasonable possibility that the illegally obtained confessions contributed to the conviction.

(See also *Fahy* v. *Connecticut* (1963) 375 U.S. 85, 91 [84 S.Ct. 229, 11 L.Ed.2d 171].)

"Similarly, applying the test prescribed in *People* v. *Watson*, 46 Cal.2d 818, 835 [299 P.2d 243], we find that there is no reasonable probability that a result more favorable to the defendant would have been reached here had the illegally admitted confessions not been received in evidence. (Cal. Const., art. VI, § 4½.)"

The principles set forth in the *Cotter* opinion are clearly applicable here; they serve to eliminate any legitimate objection to the conviction. (See also *People* v. *Ford*, 234 Cal.App. 2d 480 [44 Cal.Rptr. 556]; *People* v. *Propp*, 235 Cal.App.2d 619, 644-645 [45 Cal.Rptr. 690]; *People* v. *Cully*, 236 Cal. App.2d 769 [46 Cal.Rptr. 644].)

I would affirm the judgment.

A petition for a rehearing was denied February 28, 1966. Conley, P. J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied March 30, 1966. Mosk, J., and Burke, J., were of the opinion that the petition should be granted.